**NEW YORK TELEPHONE COMPANY,**
**Plaintiff-Appellee,**

v.

**COMMUNICATIONS WORKERS OF AMERICA, AFL–CIO, et al.,**
**Defendants-Appellants.**

**Nos. 856–858, Dockets 71–1140 to 71–1142.**

United States Court of Appeals,
Second Circuit.

Argued April 2, 1971.

Decided June 22, 1971.

Mansfield, Circuit Judge, filed opinion concurring in part and dissenting in part.

H. Howard Ostrin, New York City (Kane & Koons, Washington, D. C.,

Cohn, Glickstein, Lurie & Ostrin, New York City, Charles V. Koons, Washington, D. C., Daniel W. Meyer, and Philip D. Tobin, New York City, on the brief), for defendant-appellant Communications Workers of America, AFL–CIO.

John F. O'Donnell, New York City (O'Donnell & Schwartz, New York City, on the brief), for defendants-appellants Local 1101 and Howard Banker.

George G. Gallantz, New York City (Proskauer, Rose, Goetz & Mendelsohn, Edward Silver, Morton M. Maneker, G. Wallace Bates and William P. Witman, New York City, on the brief), for plaintiff-appellee New York Telephone Co.

Before LUMBARD, FEINBERG, and MANSFIELD,* Circuit Judges.

LUMBARD, Circuit Judge:

In January, 1971, Judge Cannella in the Southern District of New York entered a series of judgments of civil contempt against the Communications Workers of America, CWA Local 1101 which represents the plant department employees of plaintiff New York Telephone Company in three boroughs of New York City (Manhattan, Bronx, and Brooklyn), and Howard Banker, the president of Local 1101. Judge Cannella took this action to halt a strike that he considered to be in violation of a restraining order issued on June 12, 1970, and thereafter extended by consent. By the time the strike ended, fines aggregating $625,000 had been imposed against the CWA, $1,012,500 had been levied against Local 1101, and Howard Banker was fined $99,250. Execution issued immediately upon the judgments of contempt. On February 17, 1971, a panel of this court issued a stay pending consideration of an expedited appeal.

Appellants' arguments, essentially, are that the temporary restraining order of June 12, 1970 could not and did not apply to the January strike. They also contend that the fines were improperly imposed, that Judge Cannella erred in de-

---

* When the case was argued Judge Mansfield was a district judge sitting by designation.

nying them a hearing on certain contentions, and that the international union either was not in contempt or had sufficiently purged itself. Plaintiff New York Telephone Company argues that the contempt judgments are not appealable, that the district court properly found the defendants to be in contempt of a valid and outstanding restraining order, and that the fines were properly levied so as to coerce compliance with the order.

We hold that these judgments of civil contempt are appealable. We also hold that defendants were not in contempt of the restraining order of June 12, 1970, as extended by consent. Accordingly, we reverse.

On May 27, 1970, the Telephone Company announced a temporary involuntary transfer of approximately thirteen switchmen, who repair and maintain equipment, from certain central office buildings in Brooklyn where they normally worked to three other central office buildings in Brooklyn. The latter offices needed extraordinary maintenance of new equipment to prevent overloading, so the company felt justified in selecting its most highly skilled and experienced switchmen. Local 1101 and its president, Howard Banker, protested, contending that employees should be transferred on the basis of inverse order of seniority. When attempts at settlement failed, Local 1101 commenced a boycott of all overtime work on June 11, 1970. It appears that a substantial proportion of maintenance work is performed by employees doing overtime, so that the company considered this boycott to be potentially serious.

On June 12, the company filed a complaint in the Southern District and sought a temporary restraining order, which was granted that day ex parte by Judge McGohey. Because of its importance to our decision, we describe in detail the complaint and accompanying affidavits.

Paragraph 1 of the complaint begins: "This action to enjoin a work stoppage in the form of a boycott of overtime work in violation of contract" is within the district court's jurisdiction. The succeeding paragraphs describe the parties, quote the no-strike and arbitration provisions of the collective bargaining agreement, and the history of the switchmen's transfer dispute. Paragraph 14 then states that "[d]efendants' unlawful acts, as set forth above, are jeopardizing plaintiff's ability to furnish telephone communication," and that there is no adequate remedy at law. Paragraph 15 is an allegation of irreparable injury to the company and the public from "this illegal work stoppage." On the basis of the foregoing, the complaint prayed for an injunction against "engaging in, or organizing, inducing, or encouraging others to engage in any strike, work stoppage, boycott of overtime work, slowdown or any other form of interference with the business of plaintiff."

Saul Scheier, an attorney for the company, submitted an attorney's certificate pursuant to Rule 65(b), Fed.R.Civ.P., stating that he had advised one of defendants' attorneys by telephone that the company would apply for "a temporary restraining order against the work stoppage currently in effect."

The company's assistant vice president for personnel relations, W. Ricks Littel, submitted an affidavit "in support of plaintiff's application for a temporary restraining order against a work stoppage in effect by over 14,000 employees in Manhattan, The Bronx and Brooklyn in the form of an overtime boycott" (paragraph 1). Paragraph 2 alleges that the transfer dispute is arbitrable under the collective bargaining agreement and that the unions have refused to arbitrate. That paragraph concludes:

"The issuance of an immediate temporary restraining order to prevent the concerted refusal to work overtime as required by the collective bargaining agreement will prevent the loss of a large number of man hours which would otherwise be available over the weekend in the form of mandatory overtime * * *"

The Littel affidavit proceeds to describe the parties, the collective bargaining agreement, the transfer dispute, and the harm engendered by an overtime boycott. Paragraph 24 states that the company has taken emergency measures to improve service, but:

"The response of the defendant unions has been to engage in an unprecedented number of work stoppages of various types including overtime embargoes such as the one involved in this action. The prompt and effective enforcement of the no strike clause of the collective bargaining agreement can stop the increasing resort by defendant unions to these illegal work stoppages * * * The dispute which has given rise to the present work stoppage can and should be settled by immediate arbitration as the collective bargaining agreement provides."

Finally, paragraph 25 of the Littel affidavit concludes:

"The Restraining Order now being requested from the Court is essential to prevent serious, immediate and irreparable injury to the Company and to the public as the result of the present work stoppage."

Despite the limited nature of the complaint and supporting affidavits, the temporary restraining order as drawn up by the company and signed by Judge McGohey, echoing the language used in the complaint's "wherefore" clause, enjoined the defendants "from engaging in, or organizing, inducing or encouraging others to engage in any strike, work stoppage, boycott of overtime work, slowdown or any other form of interference with the business of plaintiff."

On June 22, 1970, Judge Lasker extended the temporary restraining order until July 2. On June 30, the parties, who were then engaged in discussions looking toward settlement of the switchmen's transfer dispute, stipulated that plaintiff's motion for a preliminary injunction be adjourned indefinitely, subject to the right of defendants to request a hearing on the preliminary injunction at any time. The temporary restraining order would be extended until such time as the motion for a preliminary injunction was decided. Judge Lasker so ordered on July 1.

The union ceased its overtime boycott upon issuance of the restraining order, and the parties subsequently reached agreement on the thirteen switchmen. By August, these switchmen had returned to their original stations.

On January 11, 1971, members of Local 1101 commenced a strike over the company's importation of workers from other areas to upgrade service in New York City—the so-called "Service Improvement Program." The company instituted this program in January after a supplemental agreement had been negotiated with the CWA.[1] The main complaint of Local 1101 was that its members were not receiving their fair share of available overtime vis-a-vis the imports.

On January 10, 1971, the eve of the strike, the company obtained an order against the CWA, Local 1101, and Howard Banker to show cause why they should not be held in civil contempt of the restraining order issued June 12, 1970, as extended. A hearing began before Judge Cannella on the morning of January 11. At the outset Mr. Ostrin, CWA's attorney, started to argue that the restraining order covered a different dispute and that a federal court could not enjoin the current dispute, but Judge Cannella interjected that the stipulation extending the restraining order was being violated. That afternoon counsel for Local 1101 and Howard Banker, Mr.

---

1. The agreement, dated December 21, 1970, provided that in accepting requests for temporary transfers into Brooklyn and Manhattan, "Local 1101's jurisdiction shall be considered first, then the rest of the State," to the extent practicable. Other provisions dealt with travel allowances, advancements in grade, and that "overtime assignments at locations from which craftsmen have been transferred will continue to be handled as in the past."

O'Donnell, argued that the "restraining order arose out of an entirely different matter, and as far as the defendants I represent are concerned, they never dreamt that it had anything whatever to do with the new matter, which is entirely different, separate and apart." Mr. O'Donnell also pointed out that the affidavit—presumably the Littel affidavit, *supra*—specified only the switchmen's transfer dispute. Mr. Ostrin joined in Mr. O'Donnell's contention. Judge Cannella ruled, however, that the terms of the restraining order were clear and that as a matter of law defendants had violated it. On January 16, Mr. O'Donnell again argued without success that he was entitled to a hearing to show that the restraining order "had absolutely nothing to do with this case."

At 5:15 P.M. on January 11, Judge Cannella entered his first order of civil contempt against Local 1101 and Howard Banker, finding that they "willfully and deliberately have violated this Court's temporary restraining order." "In order to secure compliance" with this restraining order, he ordered fines imposed on a gradually increasing scale as the strike should continue, and that "said fines shall be paid to plaintiff forthwith at the time they accrue." The Clerk was directed to enter judgments of civil contempt in favor of the company forthwith when the fines accrued, and the order specified that plaintiff have execution immediately upon entry of judgment.[2]

The strike continued, and widened to other parts of New York State. On January 14, the company moved to punish the CWA for contempt of the restraining order as well for its alleged part in the spreading strike. After a hearing, Judge Cannella, in an opinion and order of January 15, concluded that the CWA had "willfully and deliberately violated the Court's temporary restraining order." He ordered that unless the CWA purged itself by 8:00 A.M. on January 18, daily fines would commence.[3]

From January 15 until the employees finally returned to work on the morning of January 25, Judge Cannella set an admirable example for his patience and his continuous efforts to get the parties to agree to immediate arbitration and an end to the strike. The walkout ended when the company acceded to the union demand that there be "full scope" arbitration (in which the union ultimately was unsuccessful). After further hearings on January 16 and 20, Judge Cannella directed additional judgments of civil contempt against Local 1101 and Howard Banker, and increased the daily fines.[4] After hearings on January 18 and 21, he held that the CWA had failed to purge itself of contempt, and continued the fines at $100,000 a day.

II.

The threshold question is whether we have jurisdiction to entertain these appeals from the judgments of civil contempt. We hold that under the particular circumstances of this case, the contempt judgments are reviewable as from a final judgment under 28 U.S.C. § 1291, and also in connection with review of an

2. The schedule of fines established was as follows: If the strike was not terminated by 8:00 A.M. on January 12, Local 1101 would be fined $7,500 and Banker $250; by 8:00 A.M. on January 13, an additional $15,000 against Local 1101 and $500 against Banker; by 8:00 A.M. on January 14, an additional $30,000 against Local 1101 and $1,000 against Banker; by 8:00 A.M. (later changed to 2:00 P.M.) on January 15, an additional $60,000 against Local 1101 and $2,500 against Banker.

3. The amounts set for 8:00 A.M. on January 18, 19, and 20, respectively, were $50,000, an additional $75,000, and an additional $100,000. As in the order against Local 1101 and Banker, the clerk was directed to enter judgment of civil contempt forthwith as the fines accrued, and that plaintiff should have execution immediately.

4. On January 18, Banker was fined $35,000, and Local 1101 was fined $300,000, for the January 16–18 period. Daily fines of $100,000 against Local 1101 and $10,000 against Banker continued until the strike ceased.

interlocutory order respecting an injunction under 28 U.S.C. § 1292(a). We find that the general rule that orders of civil contempt against parties in pending litigation are not immediately reviewable, 9 Moore's Federal Practice ¶110.13[4], at 167, is inapplicable here.

Judgments were entered on these findings of civil contempt and orders setting the fines. Execution issued immediately. The defendants thus faced immediate and perhaps irreparable loss. On the other hand, the district court's decision on this aspect of the case was not tentative. Whatever the outcome of any future hearing on a preliminary or permanent injunction, these fines which were designed to coerce compliance with the temporary restraining order of June 12, 1970, remain payable. Indeed, as will appear more fully below, we read the complaint, filed on June 12, 1970, as seeking relief only against union obstruction of the transfer of switchmen in Brooklyn, the dispute which led to the restraining order's issuance. That being so, we doubt that anything further remains of the main action unless the district court grants leave to replead. Accordingly, our intervention by way of appeal runs no risk of disrupting the orderly course of proceedings below. Nor does the key issue presented for decision, under the view we take of the case, bear any relationship to issues that might arise from a hearing for a preliminary or permanent injunction. That issue is the proper interpretation of the restraining order issued on June 12, 1970, and whether the strike of January, 1971 falls outside this order's scope. We therefore think that the factors favoring appealability as from a final judgment under § 1291 are present, and that the policy considerations which have led courts to deny immediate review to civil contempt orders are absent.

■■■ As the Court held in Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 546, 69 S.Ct. 1221, 1225, 93 L.Ed. 1528 (1949), an appeal may be had from those decisions "which finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated." The Court also explained that the purpose of § 1291 is to disallow appeals from "tentative, informal or incomplete" determinations, or those that are merely steps toward final disposition of the merits. But this latter qualification does not include matters "not of such an interlocutory nature as to affect, or to be affected by, decisions of the merits." *Id.*; see Note, Procedures for Trying Contempts in the Federal Courts, 73 Harv.L.Rev. 353, 359 n. 41 (1959).

We have consistently followed this practical interpretation and application of § 1291. In McDonnell v. Birrell, 321 F.2d 946 (2d Cir. 1963), we entertained an appeal from a post-judgment order that the judgment debtor pay monthly installments until his liability was satisfied, noting that the order was immediately enforceable, disposed of that aspect of the proceedings, and was entirely divorced from those aspects still pending. That appeal was heard even though there was no contempt because we considered it pointless to wait. And in Vincent v. Local 294, Int'l Bhd. of Teamsters, 424 F.2d 124 (2d Cir. 1970), we reviewed a judgment of civil contempt for violation of an injunction under section 10(*l*) of the National Labor Relations Act because, *inter alia*, of the predicament of the defendant's being subject to continuing liabilities under an injunction we concluded was no longer in effect.

The company's reliance upon Fox v. Capital Co., 299 U.S. 105, 57 S.Ct. 57, 81 L.Ed. 67 (1936), is misplaced. There, an order finding the judgment debtor in civil contempt for his refusal to submit to an examination in proceedings supplementary to judgment was held to be nonreviewable because the proceeding was in its initial stages and the final relief was a matter of conjecture. *Id.* at 108, 57 S.Ct. at 57. In the present case, execution issued immediately and the collateral proceeding has been concluded.

The company also cites Cobbledick v. United States, 309 U.S. 323, 60 S.Ct. 540, 84 L.Ed. 783 (1940), for a strong statement of the policy underlying the final judgment rule, but neglects to note Mr. Justice Frankfurter's qualification that the order there, a subpoena to appear before the grand jury, would be appealable if the witness refused to appear and was found in contempt. Then the witness' situation would be "so severed from the main proceeding as to permit an appeal." *Id.* at 328, 60 S.Ct. at 542.

■■ Comptone Co. v. Rayex Corp., 251 F.2d 487 (2d Cir. 1958), where we refused to review an order of civil contempt for violating a temporary restraining order, does not support the company's position. We there noted that no penalty had been imposed and the contempt order remained merely a finding, without judgment thereon, subject to modification at any time. The cute phrase "he carries the keys of the prison in his own pocket," Doyle v. London Guarantee & Accident Co., 204 U.S. 599, 607, 27 S.Ct. 313, 315, 51 L.Ed. 641 (1907), bears little relation to the instant case as it reaches us. Finally, the company's argument that no appeal lies from a consent order, whatever its validity as a jurisdictional argument, clearly cannot be applied to a later dispute respecting the order's scope. The alternative argument that the time for filing the notice of appeal commenced running on July 1, 1970, is frivolous. For the foregoing reasons, we conclude that the contempt judgments are reviewable as final judgments under § 1291.

■ We also find that these judgments are reviewable in connection with an appeal from an interlocutory order respecting an injunction under 28 U.S.C. § 1292 (a) (1). That section permits an appeal from an interlocutory order "granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions." In effect, the July 1, 1970 consent to the temporary restraining order's indefinite extension changed that order into a preliminary injunction. Cf. Pan American World Airways, Inc. v. Flight Engineers' Int'l Ass'n, 306 F.2d 840, 843 (2d Cir. 1962). Although Rule 65(b), Fed.R.Civ.P., provides that a temporary restraining order may be extended indefinitely by consent, that definition is not conclusive for purposes of § 1292(a) (1). At least where the restraining order has been in effect for many months and where there is no possibility of interfering with the district court's orderly disposition of a motion for a preliminary injunction, the rationale against reviewing a grant or denial of a temporary restraining order is absent.

■ We believe that the words "refusing to dissolve or modify injunctions" as used in § 1292(a) (1) encompasses the district court's refusal in this case to hear argument or evidence pertaining to the order's scope. In either instance, there is a possibility of drastic consequences which cannot later be corrected. *Pan American, supra.* We see no sound reason to suppose that the Congressional judgment as to the importance of immediate review of interlocutory orders refusing to alter or dissolve injunctions does not extend with equal force to a non-hypothetical dispute as to an injunction's breadth, inasmuch as clarification and modification may be virtually indistinguishable. *See* Developments in the Law—Injunctions, 78 Harv.L.Rev. 994, 1085 (1965). Indeed, defendants' arguments in the court below and here which we accept have the practical consequences of a dissolution of the restraining order.

### III.

■ In light of the complaint and affidavits submitted by the company to secure the restraining order which Judge McGohey issued on June 12, 1970, we believe that order, despite the broad language as drawn ex parte by the company, was meant to apply and should only be applied to the switchmen's transfer dispute then occurring in Brooklyn. See N.L.R.B. v. Heck's Inc., 388 F.2d 668 (4th Cir. 1967); Star Bedding Co. v. Englander Co., 239 F.2d 537, 541 (8th

Cir. 1957); Goldberg v. Trakas, 206 F. Supp. 867, 869 (E.D.S.C. 1962). As detailed in part I, *supra*, the complaint and affidavits are replete with such phrases as "action to enjoin a work stoppage in the form of a boycott of overtime work," "temporary restraining order against the work stoppage currently in effect," "prevent the concerted refusal to work overtime," and "irreparable injury to the Company as the result of the present work stoppage."

Despite the clearly limited phrasing of all the moving papers, the company now argues that it really sought a broad injunction against all concerted activity interfering with the company's business, even though it must have known that such a federal court injunction was virtually impossible under the Norris-La-Guardia Act, 29 U.S.C. § 101 et seq., and the June 1, 1970 decision of the Supreme Court in Boys Markets, Inc. v. Retail Clerks Union, Local 770, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199. The Company can point to only one paragraph in the moving papers that lends arguable support to their contention, and this is found in the Littel affidavit and not the complaint. Paragraph 24 of that affidavit reads that the response of the unions to its attempts to improve service

"has been to engage in an unprecedented number of work stoppages of various types including overtime em-

bargoes *such as the one involved in this action.* The prompt and effective enforcement of the no strike clause of the collective bargaining agreement can stop the increasing resort by defendant unions to these illegal work stoppages * * *." (Emphasis added.)

But this is followed by paragraph 25, the concluding paragraph, which requests that "the present work stoppage be restrained." Read in conjunction with the clause "such as the one involved in this action," *supra*, and indeed with every other paragraph of the moving papers, paragraph 24 manifestly is the typical unsupported conclusory allegation that universally finds its way into affidavits with the hope of influencing the court's response. It in no way prays for broader relief, nor does it specify what other work stoppages occurred or were threatened.[5]

■ If, as we hold, Judge McGohey's ex parte restraining order of June 12, 1970, applied only to the switchmen's transfer dispute, it seems obvious that the terse stipulation of June 30, providing that the "temporary restraining order entered herein on June 12, 1970, shall be extended," cannot add new content to that restraining order. The company has failed to offer a satisfactory explanation as to why the union would consent to forfeit all opportunity for concerted activity upon threat of sum-

5. In its brief on appeal, the company for the first time cites four instances of litigation between the parties, which involve only two disputes. Moreover, two of these decisions were rendered in the latter part of 1970, after the temporary restraining order had been extended. New York Telephone Co. v. Beirne, N.Y.L.J., July 10, 1969 (Sup.Ct., N. Y. County), was a motion by the company for a preliminary injunction and to punish the local union (apparently Local 1103, not Local 1101) for contempt of a restraining order. The contempt was denied "since it appears that during the period of restraint both sides ignored the contractual provisions." New York Telephone Co. v. Beirne, N.Y.L.J., Nov. 23, 1970 (Sup.Ct., N. Y. County), ordered the company and Local 1103 to proceed

to arbitration, upon the understanding that the company would withdraw its motion to punish for contempt when the employees returned to work.

Kaynard v. Communications Workers, 69 Civ. 1372 (E.D.N.Y., Nov. 4, 1969), and Communications Workers of America (New York Telephone Company), 186 N.L.R.B. No. 91 (Nov. 22, 1970), involved, respectively, a preliminary injunction and N.L.R.B. finding that the union's failure to work overtime in October, 1969, in protest against the company's wage modifications was an unfair labor practice.

Thus, the company has still fallen far short of showing that a blanket injunction was colorably permissible, especially in federal court.

mary contempt. It claims that the defendants secured the right to postpone indefinitely, at their discretion, the motion for a preliminary injunction. This is an odd bargain indeed. The company would have us believe that the unions gave up more than the company could have secured via a preliminary injunction and certainly far more than the company was entitled to under the allegations of its complaint. But we are told that "[d]efendants thus avoided a full exploration of their prior illegal conduct and the permanent effect of an adverse determination against them on that issue." Whatever the company means by this argument, it presupposes utter irrationality on the unions' behalf since the company could advance its supposed proof whenever the union tried to wriggle out from under the blanket injunction. In fact, there is no *quid pro quo* since nothing in the stipulation would bar the company from commencing new actions at any time and spreading the dirty linen in public. Thus, the defendants secured no guarantee that they could control the time when their "prior illegal conduct" would be explored. Indeed, as the cases described in note 5, *supra,* demonstrate, their alleged prior illegalities already were being scrutinized in the state courts and before the National Labor Relations Board.

Far more likely than the company's explanation is the unions' contention that they thought the restraining order applied only to the particular dispute whose settlement was being negotiated. In any event, we do not believe that belated theories should alter our conclusion that the restraining order only applied to the switchmen's transfer dispute, and that a consent to its extension without more cannot enlarge its terms. Nor do we see any necessity to remand for a hearing to find the "true intent" of the parties. Without deciding whether the parties by consent may suspend section 4 of the Norris-LaGuardia Act—which deprives federal courts of the power to enjoin a wide variety of concerted action in labor disputes—in its entirety, this should have been clarified before Judge Lasker approved the stipulation and a written memorandum to that effect should have been executed and made a part of the record if the union and the company did so agree.

Even if we considered the restraining order's scope to be a closer issue, several policy considerations counsel us to resolve all ambiguities in favor of the unions. First, Rule 65(d) of the Federal Rules of Civil Procedure expresses a policy against vague decrees that can transform the contempt power from a "potent weapon" into a "deadly one." International Longshoremen's Ass'n, Local 1291 v. Philadelphia Marine Trade Ass'n, 389 U.S. 64, 76, 88 S.Ct. 201, 19 L.Ed.2d 236 (1967). An overly broad decree whose terms are divorced from the relief sought may be as ambiguous as a vague decree. McComb v. Jacksonville Paper Co., 336 U.S. 187, 197, 69 S.Ct. 497, 93 L.Ed. 599 (1949) (Frankfurter, J., dissenting). Accordingly, at times we have found it necessary to construe the language of an injunction consistently with plaintiff's complaint and the relief to which he was entitled under the appropriate legislation. Douds v. Local 1250, Retail Wholesale Dep't Store Union, 173 F.2d 764 (2d Cir. 1949); NLRB v. New York Merchandise Co., 134 F.2d 949 (2d Cir. 1943).

In NLRB v. Heck's Inc., 388 F.2d 668 (4th Cir. 1967), the Fourth Circuit denied an NLRB petition to adjudge a company in civil contempt under circumstances analogous to the present case. The company had consented to an order that it cease and desist from unlawful interrogation, interference, and the like. The order also provided that it post copies of the order at one of its stores. During the hearing, the trial examiner remarked that this store was the only location involved in the proceeding. The Board's contempt petition was based on the employer's conduct at different stores in the same area. The court recognized that the Board had the power to enjoin unfair labor practices at

all stores on the basis of violations at one store, and that the company had consented to the order. Nevertheless, the policy expressed in the specificity requirement of Rule 65(d) induced the court to construe the cease and desist order as applying only to the one store.

New York Telephone Company directs our attention to United States v. Armour & Co., 402 U.S. 673, 91 S.Ct. 1752, 29 L.Ed.2d 256 decided June 1, 1971, the latest Court decision arising from the Meat Packers Consent Decree of 1920, presumably for its statement that "[c]onsent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms," and therefore that "the scope of a consent decree must be discerned within its four corners." Aside from the obvious inapplicability of Mr. Justice Marshall's premise to the facts here, the conclusion reached clearly was designed to shield the defendant from oppression, for he then states:

"Because the defendant has, by the decree, waived his right to litigate the issues raised, a right guaranteed to him by the Due Process Clause, the conditions upon which he has given that waiver must be respected, and the instrument must be construed as it is written, and not as it might have been written had the plaintiff established his factual claims and legal theories in litigation."

Unlike *Armour*, the company would have us believe that the mere consent to a restraining order's extension should lead to the conclusion that the unions waived their right to litigate, at least temporarily, in return for the disability of being enjoined from far more than the court could have imposed had "plaintiff established his factual claims and legal theories in litigation."

Second, section 9 of the Norris-LaGuardia Act, 29 U.S.C. § 109, provides in part:

"every restraining order or injunction granted in a case involving or growing out of a labor dispute shall include only a prohibition of such specific act or acts as may be expressly complained of in the bill of complaint or petition filed in such case and as shall be expressly included in said findings of fact made and filed by the court as provided in this chapter."

The only "specific act" complained of is the overtime boycott in connection with the switchmen's transfer dispute. Although defendants' consent to the extension of the restraining order may cure Judge McGohey's failure to observe the procedures mandated by this section, it clearly expresses a policy that in those limited situations where federal courts can intervene by way of injunction, they must do so hesitantly and avoid blanket prohibitions. We feel impelled to implement that Congressional policy by narrowly construing restraining orders and injunctions issued in labor disputes, inasmuch as the generality of court orders in such cases was one of the chief abuses that led to the Norris-LaGuardia Act. *See generally* F. Frankfurter & N. Greene, The Labor Injunction (1930).

The company claims that section 9 of the Norris-LaGuardia Act does not apply to injunctions issued against strikes in violation of the collective bargaining agreement's no-strike provision where compulsory arbitration is available. We disagree. That section applies to all "labor disputes" in which a federal court can issue an injunction. See Publishers' Ass'n v. New York Mailers' Union No. 6, 317 F.2d 624 (2d Cir. 1963), *vacated in part as moot*, 376 U.S. 775, 84 S.Ct. 1132, 12 L.Ed.2d 82 (1964). Nothing in Boys Markets, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), which affirms the Court's efforts "to accommodate and harmonize this policy [peaceful settlement of labor disputes through arbitration] with those underlying the anti-injunction provisions of the Norris-LaGuardia Act," is to the contrary. 398 U.S. at 241, 90 S.Ct. at 1587. It has been held consistently that injunctions issued to enforce obligations of the Railway Labor Act must be accommodated with the Norris-La-

Guardia Act. Brotherhood of R. R. Trainmen v. Chicago River & I. R. R., 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957); Virginia Ry. v. System Federation No. 40, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789 (1937). This has meant that the provisions and policies of the latter Act apply to the extent they are not inconsistent with the Railway Labor Act. Virginian Ry., *supra,* 300 U.S. at 515, 57 S.Ct. 592 (§ 9 of the Norris-LaGuardia Act); Brotherhood of R. R. Trainmen v. Toledo, P. & W. R. R., 321 U.S. 50, 64 S.Ct. 413, 88 L.Ed. 534 (1944) ("clean hands" requirement of § 8 applied in refusing to enjoin violent strike); Rutland Ry. v. Brotherhood of Locomotive Eng'rs, 307 F.2d 21, 37–42 (2d Cir. 1962), cert. denied, 372 U.S. 954, 83 S.Ct. 949, 9 L.Ed.2d 978 (1963) (§ 8); Chicago, R. I. & P. R. R. v. Switchmen's Union, 292 F.2d 61, 71 (2d Cir. 1961), cert. denied, 370 U.S. 936, 82 S.Ct. 1578, 8 L.Ed.2d 806 (1962) (§ 4 accommodated so as to place burden on plaintiff to show Railway Labor Act violated as condition precedent to injunction); cf. United Bhd. of Carpenters v. United States, 330 U.S. 395, 67 S.Ct. 775, 91 L.Ed. 973 (1947) (Sherman Act prosecution against union subject to § 6 of Norris-LaGuardia Act limiting scope of liability for "conspiracy"). We perceive no such conflict between section 9 and the policy in favor of arbitration. Note, The New Federal Law of Labor Injunctions, 79 Yale L.J. 1593, 1606–07 n. 64 (1970). See also Brotherhood of R. R. Trainmen v. Akron & B. B. R. R., 128 U.S.App.D.C. 59, 385 F.2d 581, 613–14 (1967), cert denied, 390 U.S. 923, 88 S.Ct. 851, 19 L.Ed.2d 983 (1968).

Third, we believe that any ambiguity should be resolved in favor of the unions under Boys Markets, Inc. v. Retail Clerks Union, Local 770, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970). The Court there held that the Norris-LaGuardia Act does not bar injunctive relief against a strike in violation of a no-strike clause of the collective bargaining agreement, but only if the grievance is subject to a mandatory adjustment or arbitration procedure. *Id.* at 253, 90 S.Ct. 1583. The Court adopted limitations on the district court's power as proposed by the dissenting opinion in Sinclair Ref. Co. v. Atkinson, 370 U.S. 195, 228, 82 S.Ct. 1328, 8 L.Ed.2d 440 (1962): where the employer seeks injunctive relief, the court must first find that both parties are contractually bound to arbitrate the dispute, and the employer should be ordered to arbitrate as a condition to such relief. The *Boys Markets* decision, as the Court recognized, was "a narrow one," 398 U.S. at 235, 90 S.Ct. 1583, and did not authorize lower federal courts to issue an injunction which goes beyond the particular dispute involved. Instead, the remedy must be limited to vindicating the arbitration process. *See* Note, 71 Colum.L.Rev. 336, 342–44 (1971). By broadly construing restraining orders and injunctions, we would undermine these limitations.

These fears are not hypothetical, as the present case amply demonstrates. Article 12.01 of the collective bargaining agreement between New York Telephone Company and the CWA provides for arbitration of grievances "regarding the true intent and meaning of a provision of this Agreement, or a grievance involving a claim referable to arbitration as provided in Articles 8, 9, 10 and 15," but "the right to require arbitration does not extend to any matters other than those expressly set forth in this Article." The unions claimed below that the supplemental agreement, dated December 21, 1970, also involved a collateral understanding that disputes involving the importation of workers under the Service Improvement Program would be handled informally and not by resort to arbitration. They also claimed that the dispute fell outside the arbitration provision quoted above. These are substantial and difficult questions which were not resolved below because such an inquiry, normally a prerequisite to any injunction under *Boys Markets*, was deemed unnecesary in light of the re-

straining order of June 12, 1970. And since there was no hearing on this claim in the district court as envisaged by *Boys Markets* and section 7 of the Norris-LaGuardia Act, we are unable now to evaluate the merits of the unions' position, although that is not necessary to our decision.[6]

On the other hand, if the company could have secured an injunction in January, 1971, because the import program dispute was arbitrable, they should be required to do so—and survive a hearing challenging arbitrability and federal jurisdiction—rather than to spring a contempt upon the unions on a few hours notice. The company argues that the June, 1970, and January, 1971, disputes were similar in nature because they arose out of the company's efforts to improve service in the New York area. This proves too much. Local 1101 represents plant department employees, who are responsible for maintenance and repairs. The company always is trying to upgrade service. Thus, the logic of the company's position is that any dispute with Local 1101 is a similar controversy. Since the later disagreement involved a separate agreement between the parties and it dealt with the relationship between the local's members and out-of-town imports, we doubt that many disputes between Local 1101 and the company could be more disparate than these two.

For the above reasons, we interpret the restraining order of June 12, 1970, as extended pursuant to stipulation and order of July 1, 1970, to apply only to the controversy involving transfer of switchmen. The orders and judgments of civil contempt therefore cannot stand, regardless of what our personal opinions may be of the wisdom of the unions' conduct and their arguably haughty disregard of Judge Cannella's patient efforts to end the strike. The judgments of civil contempt were imposed, not for violation of any restraining order issued by Judge Cannella, but for violating the restraining order of June 12, 1970. Each order to show cause specified, in almost identical language, that it was "civil contempt for their disobedience of the temporary restraining order issued by this Court herein on June 12, 1970, as extended." Each order of civil contempt specified that the civil contempt was for "willfully and deliberately [having] violated this Court's temporary restraining order." The fines were imposed "[i]n order to secure compliance with this Court's temporary restraining order."

Generally, injunctions and restraining orders must be obeyed until overturned, and failure to do so is punishable as contempt even though the order is later overturned. Walker v. City of Birmingham, 388 U.S. 307, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967); United States v. United Mine Workers, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947). But we hold that the defendants did not violate the restraining order, and violation of a court order is the essential precondition to a finding of contempt. Gompers v. Bucks Stove & Range Co., 221 U.S. 418, 441, 31 S.Ct. 492, 55 L.Ed. 797 (1911); Note, Procedures for Trying Contempts in the Federal Courts, 73 Harv.L.Rev. 353, 356 (1959). Nor is the distinction merely technical because Judge Cannella might have issued his own restraining order. He did not do so, and defendants consequently were deprived of the protections afforded by the Norris-LaGuardia Act, *Boys Markets*, and general equitable principles concerning the issuance of injunctions.

We do not reach other contentions advanced by appellants. Judgments reversed.

---

6. There is no question that the issue of the restraining order's interpretation and scope was raised below. See the statements from the hearings before Judge Cannella quoted in part I, *supra*. Judge Cannella understood that this issue was raised, but rejected its merits. Transcript of Hearing, Jan. 11, 1971, at 13; *id.*, Jan. 16, 1971, at 7; *id.* at 17; *id.*, Jan. 20, 1971, at 7.

MANSFIELD, Circuit Judge (concurring and dissenting):

Except in one respect I concur in Judge Lumbard's carefully reasoned and thorough decision. Rather than hold that the June 12, 1970 temporary restraining order ("June Order") did not apply to the Union's January 1971 work stoppage, I would remand the case to the district court for a hearing to resolve that issue.

The plain, unambiguous language of the June Order, which enjoined "any strike, work stoppage, boycott of overtime work, slowdown or any other form of interference with the business of plaintiff," was unquestionably broad enough on its face to bar the January 1971 work stoppage. On June 30, 1970, the parties entered into a written stipulation, "so ordered" by the Court (Lasker, D. J.), adjourning indefinitely the Company's motion for a preliminary injunction and extending the June Order as so written until determination of that motion, which still remains undetermined. Were it not for this stipulation consenting to extension of the June Order, I agree that the order would have been vulnerable to attack under the Norris-LaGuardia Act, 29 U.S.C. § 109, and Rule 65(b), F.R.C.P. A vaild consent of the parties, however, precludes such attack. See NLRB v. Ochoa Fertilizer Corp., 368 U.S. 318, 82 S.Ct. 344, 7 L.Ed.2d 312 (1961); NLRB v. International Hod Carriers, Local 210, 228 F.2d 589, 592, n. 2 (2d Cir. 1955).

When the Union was later cited for contempt of the June Order because of its January 1971 work stoppage, it argued that the June Order, notwithstanding its apparent applicability, was not intended by the parties to bar stoppages other than the June boycott of overtime work, which arose out of the Company's transfer of certain Brooklyn switchmen. The Company took the opposite position, contending that the order was intended to be as broad in scope as its plain language stated. Faced with this issue as to intent of the parties in consenting to the June Order the district court should not, without first permitting the parties to be heard and to offer evidence, have interpreted the June Order as applying to the January strike. I believe that we should not fall into the same error by interpreting the order, on the basis of our speculation as to the parties' motives and intent, as being limited in its applicability to the June dispute. In my view the better course would be to remand the issue for a hearing.

Most of the arguments offered by the majority in support of its interpretation cut both ways. Although the Company's June 1970 complaint sought relief only against the current boycott, the supporting Littel affidavit did assert that the Union had resorted to "an unprecedented number of work stoppages of various types" and urged that the no-strike clause of the parties' collective bargaining agreement be enforced "to stop the increasing resort by defendant unions to these illegal work stoppages." If, as the Company's counsel has since advised us, the June 1970 work stoppage was but one of a series of similar stoppages, amendment of the complaint to seek broader relief would undoubtedly have been permitted as a matter of right at such an early stage in the litigation, pursuant to the liberality with which such amendments are permitted. See Rule 15(a), F.R.Civ.P. As it was, the written consent to the extension of the June Order as broadly phrased rendered such amendment unnecessary.

The majority speculates that a fearless union such as the CWA would hardly have given up so much for so little. However, the June Order allowed the Union to buy time and avoid expensive legal confrontations with the Company, which might prove unsuccessful from the Union's standpoint, due to the Supreme Court's then very recent decision in *Boys Market*. More important, the Union did not give up as much as would at first appear. It expressly retained the right, in the first paragraph of the June 30, 1970 stipulation extending the June Order, to demand an immediate

hearing at any time for the purpose of determining whether the Company's motion for preliminary injunctive relief should be granted or denied. By exercising this right, even after the Company applied for a contempt order in January, the Union could have obtained a prompt determination as to whether the June Order would be dissolved or replaced with a preliminary injunction, rather than take the law in its own hands and treat the June Order as if it were merely a "letter to a newspaper," United States v. United Mine Workers, 330 U.S. 258, 309–310, 67 S.Ct. 677, 91 L.Ed. 884 (1947). Yet the Union never asked for the forthwith hearing to which it was entitled. Instead it flagrantly flaunted Judge Cannella's acceptance of the applicability of the plain language of the June Order and his order accordingly. Even if his interpretation of the order was taken by the Union to mean that he would deny an application for a forthwith hearing to which the Union was entitled under the June Order, the proper course was to seek a Writ of Mandamus or Writ of Prohibition, Developments in the Law—Injunctions, 78 Harv. L.Rev. 994, 1077 (1965), or an expedited interlocutory appeal under 28 U.S.C. § 1292(a) (1). Cf. Davis v. Hayden, 238 F. 734, 737 (4th Cir. 1916), cert. denied, 243 U.S. 636, 37 S.Ct. 400, 61 L.Ed. 941 (1917).

Both sides were represented throughout by experienced legal counsel, not only at the time when they entered into the June 30, 1970 stipulation but also during the January contempt proceedings. Against such a background, while there may be circumstances casting doubt on whether the parties contemplated that the stipulated June Order would continue in full force and effect to bar a work stoppage unconnected with the June boycott, I am not prepared to hold as a matter of law that such astute counsel did not intend the June Order to mean what it plainly says, at least not without a hearing at which both sides can present relevant evidence. It is no answer to say, as does the majority, that if the

parties intended the broad language of the stipulated June Order to be as effective as it reads, they should have clarified the matter before Judge Lasker (who approved the stipulation) by executing a separate written memorandum. If the language of the stipulation or order were ambiguous, such a course of action might have been advisable. But here the language was plain and unambiguous. The parties expressly stipulated in writing that the Company's motion for a preliminary injunction should be "adjourned * * * without date," subject to the Union's right to request the court for a hearing at any time, and that "The temporary restraining order entered herein on June 12, 1970, shall be ·extended until the determination of plaintiff's motion for a preliminary injunction." The June Order enjoined "any strike, work stoppage, boycott of overtime work, slowdown or any other form of interference with the business of the plaintiff." It is difficult to conceive how this plain language could have been made any clearer by filing a supplemental memorandum with the court. If the language of the order was too broad, the proper course was for the Union to seek modification by the court.

"[If the terms of a consent decree] read more broadly than respondent intended that they should, the time and manner of avoiding that breadth was by objections to the decree before its entry and not by disobedience of it afterwards." NLRB v. American Manufacturing Co., 132 F.2d 740, 742 (5th Cir.), cert. denied, 319 U.S. 743, 63 S.Ct. 1030, 87 L.Ed. 1700 (1943).

"Familiar equity procedure assures opportunity for modifying or vacating an injunction when its continuance is no longer warranted." Milk Drivers Union, Local 753 v. Meadowmoor Dairies, Inc., 312 U.S. 287, 298, 61 S.Ct. 552, 557, 85 L.Ed. 836 (1941).

"The breadth and vagueness of the injunction [restricting the exercise of First Amendment rights] itself would also unquestionably be subject to substantial constitutional question.

**54**

But the way to raise that question was to apply to the Alabama courts to have the injunction modified or dissolved." Walker v. City of Birmingham, 388 U.S. 307, 317, 87 S.Ct. 1824, 1830, 18 L.Ed.2d 1210 (1967).

In concluding that the better course would be to remand the case to the district court for a hearing as to the intended scope of the June Order, I am also persuaded by a long line of cases holding that consent orders are to be interpreted and enforced as written even if they are overbroad. In Swift & Co. v. United States, 276 U.S. 311, 48 S.Ct. 311, 72 L.Ed. 587 (1928), when the company there sought to invalidate a consent decree agreed to years earlier on the grounds, *inter alia,* that it should be limited to acts in interstate commerce, the Supreme Court refused because the company had consented to its being applied to acts in interstate *and intrastate* commerce. *Id.* 330–331, 48 S.Ct. 311. See also United States v. Swift & Co., 286 U.S. 106, 116–117, 52 S.Ct. 460, 76 L.Ed. 999 (1932); McComb v. Jacksonville Paper Co., 336 U.S. 187, 192, 69 S. Ct. 497, 500, 93 L.Ed. 599 (1949) ("Respondents could have petitioned the District Court for a modification, clarification or construction of the order. * * * But respondents did not take that course either. They undertook to make their own determination of what the decree meant. They knew they acted at their peril. * * * It does not lie in their mouths to say that they have an immunity from civil contempt because the plan or scheme which they adopted was not specifically enjoined."); NLRB v. Ochoa Fertilizer Corp., 368 U.S. 318, 323, 82 S.Ct. 344, 7 L.Ed.2d 312 (1961); United States v. Armour Co., 402 U.S. 673, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971); NLRB v. International Hod Carriers, 228 F.2d 589, 592 n. 3 (2d Cir. 1955) (Frank, J.) ("Since the decree was entered with the consent of the parties, respondents [who were judged in civil contempt] do not, and cannot object to its broad scope [citations omitted]."); NLRB v. Retail Clerks International Association, 203 F. 2d 165 (9th Cir. 1953), affd. on rehearing, 211 F.2d 759, 763 (9th Cir. 1954), cert. denied, 348 U.S. 839, 75 S.Ct. 47, 99 L.Ed. 662 (1954); NLRB v. American Manufacturing Co., 132 F.2d 740, 742 (5th Cir. 1943); cf. NLRB v. M. Lowenstein & Sons, 121 F.2d 673, 674 (2d Cir. 1941) (per curiam); Evans v. International Typographical Union, 81 F. Supp. 675, 678 (S.D.Ind.1948).

Strict adherence to the foregoing line of cases would compel us to affirm the district court's decision. However, Judge Lumbard's persuasive argument to the effect that the June Order was not intended to apply as written convinces me that an issue worthy of a hearing is presented.