Carlos MORALES–FELICIANO, et al.,
Plaintiffs, Appellees,

v.

**PAROLE BOARD OF The COMMON-WEALTH OF PUERTO RICO, et al., Defendants, Appellants.**

No. 88–1942.

United States Court of Appeals,
First Circuit.

Heard April 4, 1989.
Decided Sept. 26, 1989.

Manuel A. Martin, Hato Rey, P.R. (argued), with whom Marcos A. Ramirez Lavandero, San Juan, P.R., and Ramirez & Ramirez, Hato Rey, P.R., were on brief, for defendants, appellants.

Carlos V. Garcia–Gutierrez, San Juan, P.R., with whom Jose E. Fernandez–Sein, Rio Piedras, P.R., and Law Offices of Nachman & Fernandez–Sein were on brief, for plaintiffs, appellees.

Before BREYER and SELYA, Circuit Judges, and CAFFREY,* Senior District Judge.

BREYER, Circuit Judge.

Officials of the Commonwealth of Puerto Rico, responsible for the Commonwealth's prison system (the "Commonwealth"), appeal two orders that the district court entered in July and August 1988 in a "prison conditions" case, a case which began about 10 years ago and which has involved findings of unconstitutionally poor prison conditions, agreed stipulations about a time table for improvement and the building of considerable new prison capacity. The district court has appointed monitors; it has imposed sanctions designed to produce compliance with the time tables; and, in July and August 1988 it (1) ordered the Ponce District Jail closed and (2) increased the fines imposed as sanctions for failure to meet certain parts of the time table. Initially the Commonwealth appealed from both these orders. By the time of oral argument, it had closed the Ponce District Jail, and it therefore abandoned that portion of the appeal. It continues, however, to press its appeal of the district court's August 1988 order significantly increasing the fines it must pay for each month that it keeps prisoners confined in less than 35 square feet of space per prisoner. Having reviewed the record in this case, we conclude that the district court's order is lawful.

## I.

### Background

To understand the issues the reader should keep in mind the following key events in this lengthy litigation:

a. *February 1979.* The plaintiffs began their class action complaining of unconstitutional prison conditions.

b. *September 1980.* The district court found that conditions in Puerto Rico's prisons violated the Eighth Amendment's prohibition against cruel and unusual punishment. Among other unlawful features of the system, it found serious overcrowding, with less than 20 square feet of space available for inmates in some prisons. The court entered an order requiring the Commonwealth, among other things, to provide enough additional capacity so that, as a temporary, initial matter, every inmate had at least 35 square feet of space. It also required the Commonwealth to submit plans for providing at least 55 square feet in dormitories and 70 square feet in individual cells on a permanent basis. *See Morales–Feliciano v. Romero–Barcelo*, 497 F.Supp. 14, 41 (D.P.R.1979).

c. *March 1986.* The district court found that the Commonwealth's prisons still did not comply with the Constitution. Citing "lengthy noncompliance [with the court's 1980 order] by defendants," *Morales–Feliciano v. Romero–Barcelo*, 672 F.Supp. 591, 622 (D.P.R.1986), the court appointed monitors, who looked into prison conditions and met with the parties.

d. *September 1986—January 1987.* In September the parties entered into a "stipulation" that the Commonwealth would meet the "35 square foot" standard by the end of 1986 and the "55 square foot" standard by the end of 1987. The court approved the stipulation in January 1987 and ordered the Commonwealth to comply with its terms.

e. *July 1987.* Although the Commonwealth built additional capacity in 1986 and 1987, prison inmate population rose from 5400 to 7000 (between August 1985 and July 1987). In July 1987, the district court found that the Commonwealth had not met the "35 square foot" standard. It held the Commonwealth in contempt of its September 1980 and January 1987 orders. It assessed a fine of $50,000 for the past failure, and a prospective fine of $10 per day per inmate for each inmate

---

* Of the District of Massachusetts, sitting by designation.

held in excess of a facility's "35 square foot" capacity. (For example, if the Commonwealth held 200 inmates in a facility that could hold 150 giving each prisoner 35 square feet, the fine would be $10 times 50 or $500 per day.) *See Morales–Feliciano v. Hernandez–Colon,* 697 F.Supp. 26 (D.P.R.1987).

f. *July—September 1987.* The Commonwealth, pointing to the still increasing prison population, asked the court to extend the "35 square foot" deadline until November 1987, by which time, the Commonwealth said, it would meet the "35 square foot" standard. In mid-September 1987 the court denied the request. *See Morales–Feliciano v. Hernandez–Colon,* 672 F.Supp. 627 (D.P.R. 1987). In late September the court, in another order, increased certain fines (not directly relevant here) and warned the Commonwealth that it was considering "additional sanctions."

g. *April 1988.* The court, after hearing from the monitors and the parties, and taking account of weather-related construction delays, postponed the *"55 square foot"* deadline from the end of 1987 to the end of 1988.

h. *July 1988.* The district court ordered the Commonwealth to close the Ponce District Jail (where conditions were particularly poor) by the end of 1988. *See Morales–Feliciano v. Hernandez–Colon,* 697 F.Supp. 37 (D.P.R. 1988). The Commonwealth initially opposed the order, for it feared its new facilities would not be ready in time. But, by the time of oral argument on this appeal, the new facilities were ready and the Commonwealth has closed the Jail.

i. *August 1988.* The district court, noting that the Commonwealth's prisons still did not meet the *"35 square foot"* standard, increased its "noncompliance" fine from $10 per excess inmate per day to $50 per excess inmate per day. It also provided that the fine rate would increase by $10 per month beginning in September, so that by April 1989 it would amount to $130 per excess inmate per day. If the Commonwealth's counsel's estimate of 800 to 900 "excess" inmates

in April 1989 is correct, the fine for April would have amounted to $3900 per excess inmate or $3,510,000. The Commonwealth appeals from this August order.

## II.

### *Appealability*

■ The plaintiffs, pointing to authority holding that civil contempt orders are ordinarily "interlocutory," that is, not "final," *see* 28 U.S.C. § 1291, "injunctive," *see* 28 U.S.C. § 1292(a)(1), or "collateral," *see Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. 541, 546–47, 69 S.Ct. 1221, 1225–26, 93 L.Ed. 1528 (1949), argue that the August order is not appealable. *See Fox v. Capital Co.,* 299 U.S. 105, 107, 57 S.Ct. 57, 58, 81 L.Ed. 67 (1936); 11 C. Wright & A. Miller, *Federal Practice & Procedure: Civil* § 2960 at 592 (1973) ("A civil contempt order is interlocutory and, as to a party to the litigation, an appeal is not available until there is a final judgment in the entire action.") Indeed, the plaintiffs add, the August order is not even a finding of "contempt;" rather, it is simply an increase in a sanction related to an earlier finding of contempt (July 1987), and therefore (in plaintiff's view) still less "appealable."

As one court has noted, however, "[e]xceptions to the rule [that civil contempt orders are not final] are plentiful." *Drummond Co. v. District 20, UMW,* 598 F.2d 381, 383 (5th Cir.1979). Those exceptions are all based on the principle that the requirement of finality is to be given a "practical rather than a technical construction," *Cohen v. Beneficial Loan Corp.,* 337 U.S. at 546, 69 S.Ct. at 1226. They reflect a weighing of "the inconvenience and costs of piecemeal review on the one hand and the danger of denying justice by delay on the other." *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 171, 94 S.Ct. 2140, 2149, 40 L.Ed.2d 732 (1974) (quoting *Dickinson v. Petroleum Conversion Corp.,* 338 U.S. 507, 511, 70 S.Ct. 322, 324, 94 L.Ed. 299 (1950)).

In this case, to allow appeal threatens neither the "inconvenience" nor the "costs"

associated with "piecemeal review." *Eisen,* 417 U.S. at 171, 94 S.Ct. at 2149. *See New York Telephone Co. v. Communications Workers of America,* 445 F.2d 39, 45 (2d Cir.1971) (finality determination depends in part on the "risk of disrupting the orderly course of proceedings below"). The appeal does not interrupt a trial on the merits, for any dispute on the merits (either of the constitutional violation or the remedial need to provide more than 35 square feet per prisoner) ended long ago. The district court entered an injunction embodying the "35 square foot" requirement 9 years ago; the Commonwealth stipulated that it would quickly satisfy this requirement more than 2 years ago; there is no reason now to think the Commonwealth will further litigate the merits. Moreover, the issues raised here concern neither the merits of the underlying constitutional questions nor the legal validity of the "35 foot" requirement. Rather, they concern only compliance. *See Drummond,* 598 F.2d at 384 (contempt order reviewable when only issue on appeal was applicability of injunction to allegedly contemptuous conduct); *New York Telephone,* 445 F.2d at 45 (contempt order reviewable when only issues on appeal were interpretation of restraining order and compliance with that order).

At the same time, to force the Commonwealth to wait for a "final judgment" to appeal the civil contempt order risks "denying justice by delay." *Eisen,* 417 U.S. at 171, 94 S.Ct. at 2149. We have no reason to believe the court intends to enter a further document called "final judgment," at least not in the near future. And, given the nature of the contempt order, the sums of money that, in theory, might be involved several years from now are so huge, that an appeal at that time would likely prove too late to offer the Commonwealth meaningful relief. *Cf. In re American Colonial Broadcasting Corp.,* 758 F.2d 794, 803 (1st Cir.1985) (finality requirement does not apply when irreparable injury may be caused by delaying appellate review until litigation is over).

Thus, we think the civil contempt order in this case resembles those appealable orders where the district court has entered the contempt order after a final judgment and a party has appealed seeking review, not of the legal merits of the basic case, but only of the legal validity of the order of contempt itself. *See Cabrera v. Municipality of Bayamon,* 622 F.2d 4, 7 (1st Cir.1980); *Vincent v. Local 294, Int'l Bhd. of Teamsters,* 424 F.2d 124, 128 (2d Cir. 1970); 9 *Moore's Federal Practice* § 110.13[4], at 168 (1989). Although the district court has not entered a judgment called "final," its injunction and later decrees are functionally equivalent to a final determination of the legal merits, for the parties no longer dispute their legal validity and the district court seems unlikely to make any further "final" determination of the merits in the near future. Since the appealability of a civil contempt order is a matter of practical, rather than formal legal, considerations, *see Cohen,* 337 U.S. at 546, 69 S.Ct. at 1225, we conclude that the Commonwealth's appeal is legally valid.

## III.

### *The Legal Merits*

■ 1. The Commonwealth makes two arguments to back its claim that the district court could not lawfully find it in contempt of the January 1987 order—an order that embodied the Commonwealth's own agreed-upon time schedule for relieving severe prison overcrowding. First, it says that it "substantially complied" with the order, at least in respect to providing each prisoner with at least 35 square feet of space. *See Fortin v. Commissioner of Mass. Dep't of Pub. Welfare,* 692 F.2d 790, 797 (1st Cir.1982) (assuming, but not deciding, that "substantial compliance" is sufficient to avoid contempt); *see also General Signal Corp. v. Donallco, Inc.,* 787 F.2d 1376, 1379 (9th Cir.1986) (using a substantial compliance standard). We note, however, that "substantiality" of compliance depends upon "the nature of the interest at stake and the degree to which noncompliance affects that interest." *Fortin,* 692 F.2d at 795. Here, the interest at issue— the prisoner's Eighth Amendment inter-

est—is "fundamental," *see Robinson v. California*, 370 U.S. 660, 666, 82 S.Ct. 1417, 1420, 8 L.Ed.2d 758 (1962) (Eighth Amendment is an aspect of Fourteenth Amendment due process); *Palko v. Connecticut*, 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937) (Fourteenth Amendment due process includes those "principle[s] of justice so rooted in the tradition and conscience of our people as to be ranked as fundamental"); the relevant harm (confinement in an area smaller than 5 by 7 feet) is significant; the number of prisoners suffering that harm (7 to 10 percent of the prison population) is large; and the time since entry of the remedial decree is long. We cannot say that compliance is so "substantial" as to invalidate the finding of contempt. *See Fortin*, 692 F.2d at 797 (affirming contempt order when district court's finding that compliance was not impossible was not clearly erroneous).

▆ Second, the Commonwealth argues that it has made good faith efforts to comply with the remedial order and the court cannot expect it to do better. The Commonwealth points out that, in recent years, it has dramatically increased spending on prisons. (It spent $115 million in 1977–80; $179 million in 1981–84; and $306 million in 1985–88). It has also built far more prison capacity. But, it adds, the growth of prison population from 5400 in August 1985 to 8300 by September 1988 (and to 9200 by April 1989), along with certain weather-related construction delays (which led the district court to postpone the "55 square foot" compliance date), means that overcrowding still exists.

"Good faith" efforts, however, do not automatically constitute a sufficient legal excuse for failing to carry out the district court's order. *Fortin*, 692 F.2d at 796–97 ("Good faith alone is not a defense to civil contempt.... [I]mpossibility would be a defense to contempt, ... [but] the test of impossibility may be particularly strict [where] the needs of [the plaintiffs] are urgent.") (citations omitted). *See McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191, 69 S.Ct. 497, 499, 93 L.Ed. 599 (1949) ("The absence of wilfulness does not re-

lieve from civil contempt."); *see also United States v. Bryan*, 339 U.S. 323, 330, 70 S.Ct. 724, 730, 94 L.Ed. 884 (1950) (contemnor can defend against contempt charges "by proving that he is unable to comply"). The Commonwealth has explained why compliance became more difficult than it initially anticipated. But it has not shown that causes beyond its control have made it overwhelmingly difficult or anywhere near impossible to give each prisoner 35 square feet of space. The Commonwealth has had considerable time to meet its self-imposed deadline, whether one counts from September 1986, when it agreed to the deadline, or from November 1987, its own proposed "postponement" date (which the court rejected). The percentage of prisoners still housed in less than 35 square feet is modest; it is not clear why the Commonwealth could not provide at least temporary space of sufficient size while it builds permanent extra capacity. Of course, building extra space is expensive, but budgetary constraints ordinarily do not, in and of themselves, provide a legal excuse for noncompliance. *Cf. Lareau v. Manson*, 651 F.2d 96, 104 (2d Cir.1981) (state's interest in spending less money on prisons cannot excuse overcrowding).

The Commonwealth points to *Nelson v. Collins*, 659 F.2d 420 (4th Cir.1981) as authority for the proposition that a circuit court will reverse a contempt finding when a state has exercised "reasonable diligence" in complying with a district court's "prison overcrowding" decree. But in *Nelson*, the district court premised its contempt finding on continued overcrowding caused in part by the court's own refusal to allow the state to "double-cell" some prisoners in another prison. The Fourth Circuit reversed this latter finding, permitting the double-celling, thereby eliminating the overcrowding, and consequently eliminating the contempt. *See Nelson*, 659 F.2d at 429. Here, the Commonwealth continues to maintain conditions in which significant numbers of prisoners are held in less than 35 square feet of space.

In sum, we believe the district court could find that it was within the Common-

wealth's power to comply with its own "35 square foot" timetable. That being so, and given the extent to which the prison system remained out of compliance, we believe the district court could find, in August 1988, that the Commonwealth had failed to meet the court's (and its own) time schedule; that it remained in contempt; and that further monetary sanctions were appropriate.

■ 2. The Commonwealth also argues that the amount of the sanction assessed (initially $50 per excess prisoner per day, with a rate increase of $10 per month) is unreasonably, and hence unlawfully, high. Since the purpose of the sanction in this case is to induce compliance with the court order, its reasonableness depends upon "the character and magnitude of the harm threatened by continued contumacy, and the probable effectiveness of any suggested sanction in bringing about the result desired." *United States v. UMW*, 330 U.S. 258, 304, 67 S.Ct. 677, 701, 91 L.Ed. 884 (1947). The law permits the district court considerable leeway in making this assessment. *Cabrera v. Municipality of Bayamon*, 622 F.2d at 7. Several factors, taken together, lead us to conclude that the fine, though high, is lawful.

First, the threatened harm (providing less than 35 square feet per inmate) is serious, particularly in the context of the prison conditions that originally led to this lawsuit, *see Morales–Feliciano v. Romero–Barcelo*, 497 F.Supp. at 20–33 (finding a variety of conditions which exacerbated overcrowding). *Cf. id.* at 35 (citing 75 square feet minimum set by the American Correctional Institute); National Sheriffs Ass'n Handbook on Jail Architecture (1975) (70–80 square feet minimum for single occupancy rooms); National Sheriffs Ass'n Manual on Jail Administration (1970) (55 square feet minimum per occupant for multiple occupant cells); Report of the Special Civilian Committee for the study of the United States Army Confinement System (1970) (55 square feet minimum adopted by the Army). *But cf. Rhodes v. Chapman*, 452 U.S. 337, 348 n. 13, 101 S.Ct. 2392, 2400 n. 13, 69 L.Ed.2d 59 (1981) (expert opinions

are "helpful and relevant" but do not suffice to establish contemporary standards of decency). Second, as of August 1988, a significant number of prisoners (estimated at 600 to 700) were held under these conditions. Third, the Commonwealth itself stipulated that it would meet the minimal 35 square foot standard by December of 1986, and then argued that, in any event, it could meet it by November of 1987. Fourth, the delays in meeting the standard have been many and serious. They have led the district court to impose sanctions, and then to warn of serious further sanctions. Fifth, the Commonwealth has not demonstrated any special reason that would lead us to think it cannot meet the "35 square foot" standard. Sixth, the fines, though steep, are geared to the extent of noncompliance, and they should diminish rapidly as the Commonwealth builds additional space or employs temporary alternatives. Seventh, the fine money has been deposited in an interest-bearing account, and the district court may decide to use it to help defray relevant costs.

■ 3. The Commonwealth argues that the court issued its August order without the prior hearing that the law requires. *See Washington Metro. Area Transit Auth. v. Amalgamated Transit Union, Nat. Capital Local Div. 689*, 531 F.2d 617, 620 (D.C.Cir.1976) (civil contemnors who assert a genuine issue of material fact have a right to a full, impartial hearing); *Brotherhood of Locomotive Firemen and Enginemen v. Bangor & Aroostook R.R. Co.*, 380 F.2d 570, 578 (D.C.Cir.) (same), *cert. denied*, 389 U.S. 327, 88 S.Ct. 437, 19 L.Ed.2d 560 (1967). We have held before, in analogous circumstances, "that in certain settings a matter can adequately be 'heard' on the papers .... [if] given the nature and circumstances of the case, ... the parties ha[d] a fair opportunity to present relevant facts and arguments to the court, and to counter the opponent's submissions[.]" *Aoude v. Mobil Oil Corp.*, 862 F.2d 890, 894 (1st Cir.1988) (citation omitted) (discussing necessity for hearing on preliminary injunction). This case passes the *Aoude* test. The Commonwealth had adequate notice and an opportunity to

present evidence and arguments in writing. The Commonwealth points to no disputed factual matters that required an *oral* proceeding. Nor does it claim that it asked the court for such a hearing. Thus we can find no violation of any legal right. *See Commodity Futures Trading Comm'n v. Premex, Inc.*, 655 F.2d 779, 782 n. 2 (7th Cir.1981) (due process does not require evidentiary hearing when documentary evidence was sufficient to establish contempt and defendants failed to demand a hearing or assert any material issue of fact). *Cf. Yates v. United States*, 316 F.2d 718, 725 (10th Cir.1963) (right to have a plenary hearing on criminal contempt charges can be waived).

(We add that if the recent hurricane has created new, serious problems, the Commonwealth is free to call those problems to the attention of the district court.)

For these reasons the August 1988 order of the district court is

*Affirmed.*