449 F.2d 586
 EMERY AIR FREIGHT CORPORATION, Plaintiff-Appellee,
v.
LOCAL UNION 295, affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, et al., Defendants-Appellants.
 No. 1098.
 No. 1099.
 Docket 71-1561.
 Docket 71-1621.
 United States Court of Appeals, Second Circuit.
 Argued August 11, 1971.
 Decided September 24, 1971.
 
 David Scribner, New York City (Herbert A. Simon, Valley Stream, N. Y., on the brief), for defendants-appellants.
 Robert D. Foglia, New York City (Howard Franklin Cerny, New York City, on the brief), for plaintiff-appellee.
 Before FEINBERG, MULLIGAN and TIMBERS, Circuit Judges.
 FEINBERG, Circuit Judge:
 
 
 1
 Local Union 295 and its officers[1] appeal from various orders of the United States District Court for the Eastern District of New York, Walter Bruchhausen, J., which prohibit appellants from engaging in a strike and fine some of them $50,000 for contempt. The appeals arise out of a labor dispute between the Local and plaintiff-appellee Emery Air Freight Corporation. We conclude, first, that the court below lacked jurisdiction under the Norris-LaGuardia Act, 29 U.S.C. § 101 et seq., to order a preliminary injunction in this controversy and, accordingly, we reverse that order. Second, because the order holding appellants in contempt was entered without a proper hearing, we remand that issue to the district court for reconsideration. The case illustrates that haste in court often makes waste, particularly in the heated and urgent atmosphere that so frequently characterizes labor disputes that culminate in a strike. Cf. New York Telephone Co. v. Communications Workers of America, 445 F.2d 39 (2d Cir. 1971).
 
 
 2
 The controversy arises out of the negotiations between Emery and Local Union 295 for a new collective bargaining agreement covering outside employees (truck drivers, helpers and platform men). Local 295 represents various workers in the air freight industry, including those employed by Emery. Local 295 and Emery have had an established collective bargaining relationship for many years, and in the past the agreements with Emery have been the same as those reached with other employers. Indeed, the agreements in the industry have apparently been uniform. Emery's last "outside contract" with Local 295 ran from November 30, 1967 to December 1, 1970, and contained a broad arbitration clause and a commitment by the parties not to strike or lock-out before exhausting the arbitration procedure. Negotiations for a new agreement began before the expiration date. In mid-December 1970, there was apparent agreement on basic economic terms, which were incorporated into a two-page supplemental agreement. The parties are in dispute over whether this document, together with the prior (1967-1970) contract, is the entire final agreement of the parties. Emery says that it is. Local 295 denies this. It claims that the parties had reached a basic understanding only on economic issues and that further negotiations were to come regarding language and non-economic provisions, including the grievance procedure which had been a source of trouble in the past between Emery and Local 295.
 
 
 3
 In any event, the new economic provisions were put into effect immediately and a few months later, Local 295 provided Emery with a complete printed final form of the agreement. Emery refused to sign it, claiming that it did not reflect the agreement of the parties. At a meeting on April 22 between the parties, Local 295 representatives pointed out that the contract in the printed form was being signed by other employers in the industry, of whom there were about 60, and threatened an immediate strike if Emery did not follow suit. The discussion degenerated into an impasse, and Local 295 called a strike. The parties continued to talk for a while on April 22 and apparently came close to, but did not achieve, agreement.
 
 
 4
 And so this litigation began. That same evening attorneys for Emery appeared before Chief Judge Mishler of the Eastern District and obtained a temporary restraining order enjoining defendants-appellants from engaging in a strike. The order referred to a verified complaint attached thereto, which alleged an action under section 301 of the Labor Management Relations Act, 29 U.S.C. § 185, for damages and preliminary and permanent injunctive relief for alleged violations of the no-strike clause of a collective bargaining agreement between Emery and Local 295.
 
 
 5
 * Before recounting the events of the hectic next few days in this litigation, it is helpful to pause to examine the current vitality of some of the provisions of the Norris-LaGuardia Act, 29 U.S.C. § 101 et seq., since appellants rely upon that Act heavily. Only a few months ago, in New York Telephone Co., supra, we had occasion to scrutinize the Act. We pointed out, 445 F.2d at 49, that the "generality" of injunctions issued in labor disputes had been "one of the chief abuses that led to the Norris-LaGuardia Act." We emphasized that the Act still applies to all labor disputes in which a federal court can issue an injunction, that nothing in Boys Markets, Inc. v. Retail Clerk's Union, Local 770, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), is to the contrary, and that although that decision allows an employer injunctive relief in a labor dispute, such relief is "limited to vindicating the arbitration process. See Note, 71 Colum.L.Rev. 336, 342-44 (1971)." Id. Thus, before an employer in a dispute with a union can obtain an injunction, there are a number of conditions to be satisfied. Section 7 of the Act, 29 U.S.C. § 107, lists a good many of them, including the requirements that a temporary restraining order "shall be effective for no longer than five days" and that such an order should not be issued except upon "testimony under oath, sufficient, if sustained, to justify the court in issuing a temporary injunction upon a hearing after notice," and upon the condition that:
 
 
 6
 [C]omplainant shall first file an undertaking with adequate security * * * to be fixed by the court sufficient to recompense those enjoined for any loss, expense, or damage caused by the improvident or erroneous issuance of such * * * injunction, including all reasonable costs (together with a reasonable attorney's fee) and expense of defense against the order or against the granting of any injunctive relief sought in the same proceeding and subsequently denied by the court.
 
 
 7
 Section 8 of the Act, 29 U.S.C. § 108, requires a showing by the complainant that he has made "every reasonable effort to settle" the dispute. Section 9, 29 U.S.C. § 109, limits the restraints of a temporary restraining order to those "specific act * * * expressly complained of in the * * * complaint."
 
 
 8
 Similarly, in Boys Markets, the Court emphasized the conditions precedent to obtaining an injunction in a labor dispute. In overruling Sinclair Refining Co. v. Atkinson, 370 U.S. 195, 82 S.Ct. 1328, 8 L.Ed.2d 440 (1962), the Court held that a strike may be enjoined only in carefully defined circumstances. It emphasized, 398 U.S. at 253-254, 90 S.Ct. at 1594:
 
 
 9
 Our holding in the present case is a narrow one. We do not undermine the vitality of the Norris-LaGuardia Act. We deal only with the situation in which a collective-bargaining contract contains a mandatory grievance adjustment or arbitration procedure. Nor does it follow from what we have said that injunctive relief is appropriate as a matter of course in every case of a strike over an arbitrable grievance. The dissenting opinion in Sinclair [370 U.S. at 228, 82 S.Ct. 1328] suggested the following principles for the guidance of district courts in determining whether to grant injunctive relief — principles we now adopt:
 
 
 10
 "A District Court entertaining an action under § 301 may not grant injunctive relief against concerted activity unless and until it decides that the case is one in which an injunction would be appropriate despite the Norris-LaGuardia Act. When a strike is sought to be enjoined because it is over a grievance which both parties are contractually bound to arbitrate, the District Court may issue no injunctive order until it first holds that the contract does have that effect; and the employer should be ordered to arbitrate, as a condition of his obtaining an injunction against the strike. * * *" (Emphasis in original.)
 
 
 11
 Thus, as we pointed out in New York Telephone Co., supra, 445 F.2d at 50, in order to enjoin a labor dispute, the court must find that both parties are required to arbitrate the dispute and the employer should be so ordered as a condition to such relief.
 
 II
 
 12
 With this background in mind, we return to the chronicle of what transpired in the district court. The temporary restraining order already referred to was signed on April 22 at 10:30 at night without notice to defendants or a hearing. It purported to be effective until May 3, 1971, unless extended, did not order arbitration of any underlying dispute or condition employer relief upon its occurrence, and required plaintiff to file a bond of $1,000. On Friday, April 23, the restraining order was served upon the Local union and two of the four individual defendants. On the same day, defendants obtained an order to show cause, signed by Judge Mishler and returnable on Monday, April 26 at 10:00 a. m., why the temporary restraining order of April 22 should not be vacated. On Saturday, April 24, Emery obtained an order to show cause, signed by Judge Weinstein, also returnable on April 26, why defendants should not be held in contempt for failing to obey the April 22 temporary restraining order. The affidavits in support of the application alleged that Emery would suffer more than $60,000 loss each day the strike continued.
 
 
 13
 On the morning of April 26, the parties appeared before Judge Bruchhausen, and argument centered primarily on defendants' motion to vacate the April 22 temporary restraining order. Defendants claimed repeatedly that the order had been signed without compliance with the requirements of either the Norris-LaGuardia Act or the Boys Markets decision. At the argument, it became apparent that the situation had been complicated by Emery's discharge of shop stewards Moran and Hunt, defendants in this action. At 4:00 p. m. on April 26, Judge Bruchhausen issued a brief memorandum order, the full text of which was the following:
 
 
 14
 Upon due deliberation, it is ordered that the temporary restraining order herein be and same hereby is continued in full force and effect and that the contempt issue will be considered at the appropriate time and it is further ordered that the defendants forthwith direct the picketing to cease and the pickets cease and desist from picketing.
 
 
 15
 Later on April 26 the court filed a second memorandum and order, which confirmed its earlier order of that day. In a three-page opinion, Judge Bruchhausen found that plaintiff's action pertained to a labor dispute, that plaintiff was engaged in substantial air freight shipments, and that the essential dispute between the parties was whether there was a new, agreed-upon contract. However, the judge emphasized that Emery's employees had been receiving economic benefits pursuant to the supplemental agreement, which defendants claimed was not a binding contract. Finally, the judge stated that:
 
 
 16
 [T]he temporary restraining order is and was warranted, despite the provisions of the Norris-LaGuardia Act. The Court has followed the guidelines as enunciated in Boys Markets, Inc. v. Retail Clerk's Union, Local 770, 398 U.S. 235 at 254 [90 S.Ct. 1583, 26 L.Ed.2d 199], in determining to grant such relief.
 
 
 17
 Up to this point apparently there had been no full hearing upon Emery's application to hold appellants in contempt of the April 22 temporary restraining order, and there had been no resolution of that motion. The continuation of the restraining order issued at 4:00 p. m. on April 26 contained no time limitations and again did not order arbitration of any underlying dispute as a condition of granting injunctive relief to Emery. The confirming opinion issued later in the day did take note of Boys Markets, as just indicated, but did not order arbitration.
 
 
 18
 A copy of the shorter order of April 26 was served upon Local 295 and upon defendant Hunt the same evening. However, the men did not come back to work or cease picketing. During the remainder of April 26 and the morning of April 27, attempts continued to resolve the underlying dispute between the parties. Apparently at the suggestion of counsel for appellants, there was a conference before Judge Bruchhausen at about noon on April 27. On the same day, Judge Bruchhausen signed a so-called Final Order Upon Contempt Proceedings, which held Local Union 295, Hunt and Moran in contempt of court for having disobeyed the April 22 and April 26 orders and fined them the sum of $50,000 for the contempt, to be paid to Emery.
 
 
 19
 On the morning of April 28 there was a hearing before Judge Bruchhausen. Counsel for Emery argued that defendants were still disobeying the various orders already entered, and asked that the fine previously imposed be set on a daily basis. Counsel for appellants stated that there had to be a hearing if there was any application for contempt. The court indicated that the hearing had already been held but it would have a further hearing that afternoon. Counsel for appellants protested that he needed more time to prepare for it and suggested that the hearing be held two days later on April 30. This request was denied.
 
 
 20
 A hearing was held the afternoon of April 28, and various witnesses testified on behalf of Emery. Counsel for appellants stated that he was unable to participate because of his lack of opportunity to prepare and did not cross-examine any witnesses. At the close of the hearing, the court reserved judgment, pending a further report the following morning, upon Emery's request for immediate payment of the fine already imposed and for imposition of a daily fine in the amount of $66,000. On the morning of April 29, counsel for Emery reported that a great majority of its employees had returned to work and the court directed that the "fine of $50,000 and interest from April 27, 1971 will stand. * * *"
 
 
 21
 The next day, a full hearing was held upon Emery's application for a preliminary injunction, at the conclusion of which the court indicated that an injunction would issue. On June 11, 1971, the judge filed findings of fact and conclusions of law, and on June 22, signed a preliminary injunction. The judge found that the parties had entered into a new collective bargaining agreement about December 15, 1970, as Emery had claimed, that the agreement contained a no-strike clause, and that the dispute over the firing of shop stewards Moran and Hunt could have been submitted to arbitration, but defendants refused to do so. The preliminary injunction continued the prior restraints on defendants, but did not order arbitration.
 
 
 22
 On April 30, appellants filed a notice of appeal from the April 22 temporary restraining order, from the April 26 continuation of the temporary restraining order and denial of defendants' motion to vacate the earlier order, and from the Final Order Upon Contempt Proceedings dated April 27, 1971. On June 22, 1971, appellants filed a notice of appeal from the preliminary injunction.
 
 III
 
 23
 We thus come, finally, to the merits of the appeal. We note in passing that whatever questions of appellate jurisdiction there might have been in an appeal from only the April 22 and April 26 orders and the April 27 Final Contempt Order, cf. New York Telephone Co. v. Communications Workers of America, supra, 445 F.2d at 44, since the appeal from the June 22 preliminary injunction is clearly proper, 28 U.S.C. § 1292(a), we will consider the merits of the various orders.
 
 
 24
 Turning to the June 22 preliminary injunction first, we do not see how it can stand under the governing law. It is quite clear that the major dispute between the parties was whether a new contract existed. It was precisely this dispute which led to the impasse in negotiations and to the original call to strike on Thursday, April 22. Indeed, the trial court recognized this in its April 26 opinion. This dispute was not arbitrable because Emery and Local 295 had never agreed to make it so. Emery does not claim that this was an arbitrable question and the trial court did not so find. That the issue whether a new contract existed was decided by the court on June 11, after the evidentiary hearing of April 30, if anything, shows that no one regarded that issue as arbitrable. Therefore, under the Norris-LaGuardia Act, and the Boys Markets reading of it, the preliminary injunction was improper because the "`strike * * * sought to be enjoined * * * [was not] over a grievance which both parties are contractually bound to arbitrate.'" 398 U.S. at 254, 90 S.Ct. at 1594 citing Sinclair Refining Co. v. Atkinson, 370 U.S. at 228, 82 S.Ct. 1328, 8 L.Ed.2d 440 (dissenting opinion). Cf. Standard Food Products Corp. v. Brandenburg, 436 F.2d 964 (2d Cir. 1970); see Isaacson and Burka, A Fresh Look at the Labor Injunction, 43 N.Y.S.B.J. 243, 250 (1971). It is true that the subsidiary dispute over the firing of Hunt and Moran was arbitrable, once the court found that there was a new contract in effect which contained an arbitration clause. But the preliminary injunction was not limited to that dispute, and arbitration of even that lesser issue was not ordered, contrary to Boys Markets. Accordingly, the preliminary injunction as granted was improper. However, this conclusion does not dispose of the question of contempt, to which we now turn.
 
 
 25
 The Final Order Upon Contempt Proceedings, dated April 27, 1971, was based upon the conclusion of the district court that Local 295 deliberately refused to obey the court's temporary restraining orders of April 22 and April 26. Although for reasons given below the record on that issue is unsatisfactory, Emery did provide on April 28 a good deal of evidence to justify the court's conclusion. If defiance of the orders of April 22 and April 26 is what occurred, we cannot condone it even if the orders were improper. That the orders contained defects, however, seems clear. The April 22 and April 26 temporary restraining orders did not require arbitration as Boys Markets teaches. Contrary to the requirements of the Norris-LaGuardia Act, the restraints were not limited to five days. The nominal bond of $1,000 required of Emery was hardly adequate under the Act's standards. Also, the orders were issued upon affidavits rather than "upon testimony under oath."[2] 29 U.S.C. § 107. Apart from procedures required for labor disputes, Fed.R.Civ.P. 65(b)(2) states that a temporary restraining order may be granted "only if * * * the applicant's attorney certifies to the court in writing the efforts, if any, which have been made to give the notice and the reasons supporting his claim that notice should not be required." No such certification or statement of reasons appeared in the application for the April 22 order, which was granted without formal notice. In addition, this court has carried the spirit of Rule 65 further and frowned upon temporary restraining orders issued without even telephoned notice. See Austin v. Altman, 332 F.2d 273, 275 (2d Cir. 1964); Arvida Corp. v. Sugarman, 259 F.2d 428 (2d Cir. 1958).
 
 
 26
 Thus, the April 22 and April 26 temporary restraining orders were deficient in numerous respects and were improperly entered. But that they could therefore be disregarded by no means follows. As we noted by way of dictum in New York Telephone Co., supra, 445 F.2d at 51, "Generally, injunctions and restraining orders must be obeyed until overturned, and failure to do so is punishable as contempt even though the order is later overturned," citing Walker v. City of Birmingham, 388 U.S. 307, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967), and United States v. United Mine Workers, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947). However, appellants argue that the contempt found here was civil rather than criminal and that United Mine Workers, 330 U.S. at 294-295, 67 S.Ct. 677, makes clear that such contempt judgments should be set aside when the order upon which they are based is held on appeal to have been erroneously entered. Moreover, citing In re Green, 369 U.S. 689, 82 S.Ct. 1114, 8 L.Ed.2d 198 (1962), appellants argue that whatever may be the general rule, the Court has made clear since United Mine Workers that if a court is "without jurisdiction" to enter a restraining order, the order is void and violations may not be punished even as a criminal contempt.[3] Since compliance with the Norris-LaGuardia Act is a "jurisdictional" requirement, say appellants, the district court had no "jurisdiction" to enter the orders they allegedly ignored and, therefore, the contempt must be set aside. The questions raised by appellants and by the above-cited cases are substantial.[4] However, we need not decide these delicate issues because we conclude that the finding of contempt in the Final Contempt Order and the $50,000 fine were both imposed without proper regard for defendants' procedural rights and therefore must be set aside and reconsidered.
 
 
 27
 The Final Contempt Order was signed on April 27. It will be recalled that the parties appeared before Judge Bruchhausen on April 26, but the argument at that time focused on Local 295's motion to vacate the earlier temporary restraining order rather than on Emery's motion to hold defendants in contempt. The judge stated in his brief memorandum after the argument that "the contempt issue will be considered at the appropriate time," a clear indication that it had not been considered as yet. There was no formal hearing after that until April 28, one day after the Final Contempt Order was signed. It is true that the parties appeared before the judge at noon on April 27. This conference was arranged informally on no papers, was not a continuation of the hearing held on April 26, and there was no record of the proceeding. However, Judge Bruchhausen on April 28 summarized what had occurred before him on April 27. On that day, apparently, the lawyers reported to the judge that the strike was continuing because Emery refused to assign work to the two "discharged" shop stewards, and the judge thereupon read to the lawyers his "formal opinion," the three-page memorandum of April 26, which continued the temporary restraining order and made some findings about the nature of the dispute. According to the judge's summary:
 
 
 28
 After hearing the attorneys [on April 27],[5] I made the statement that unless the men returned to work forthwith, there would be a fine assessed at $50,000.
 
 
 29
 The judge then (on April 28) asked for comments by the attorneys on his summary of what had occurred. In the ensuing colloquy, counsel for Emery reported extensively on the union's "token compliance" with the prior orders of the court, emphasized Emery's continuing damages of over $60,000 each day, and made clear that he had witnesses ready to testify to support that figure. Counsel for Local 295 then stated:
 
 
 30
 Judge, at the outset, concerning your commentary regarding yesterday's events, I would point out that I came to this court for the purpose, in effect, to ask for a modification of the order whereby there can be a return to work based upon the principle. * * *
 
 
 31
 After some further discussion of various issues, including whether the men were actually going back to work, the following ensued:
 
 
 32
 Mr. Simon [counsel for Local 295]: Judge, I hear these things for the first time. I have not been served with papers. In fact, I didn't know why I was coming here this morning.
 
 
 33
 Mr. Foglia [counsel for Emery]: That likewise is inaccurate. When I served Mr. Simon I advised Mr. Simon that I would expect the people to be back at work forthwith.
 
 
 34
 I further advised Mr. Simon that in the event the people were not back forthwith, I intended to appear in court the first thing this morning and make an application before this court, so Mr. Simon is totally conversant with the reasons why he is here.
 
 
 35
 Mr. Simon: No. I mean as far as I know the people went back to work this morning. This was my information.
 
 
 36
 The Court: This report doesn't indicate it.
 
 
 37
 Mr. Simon: That is not a sworn report or anything. I don't think — I think —
 
 
 38
 The Court: You want a sworn document.
 
 
 39
 Mr. Simon: I think we have to have a hearing. Is this application for a contempt?
 
 
 40
 Mr. Foglia: The contempt has been granted.
 
 
 41
 The Court: This is certainly along that line.
 
 
 42
 Mr. Simon: Norris LaGuardia, you remember, stated in your opinion, is labor. Norris LaGuardia covers labor and contempt.
 
 
 43
 We should have a hearing with witnesses and perhaps even a jury trial.
 
 
 44
 Mr. Foglia: You know a jury trial is certainly not an issue. The Court has ruled. We also have Boys Market. It indicates injunctive relief is available under these circumstances, as a matter of fact.
 
 
 45
 The Court: Well, we had a hearing on this, and certainly those interested defendants should have been here. They knew and were informed by the order of the Court what was going on.
 
 
 46
 Mr. Simon: There was a motion to vacate the restraining order. That was on behalf of the union, and I appeared on behalf of the union. I don't know what the services were on the other defendants. I don't appear for the other defendants.
 
 
 47
 Mr. Foglia: Counsel would appear to overlook the fact that in addition to the motion made by counsel we made a motion for contempt, and a copy of that order was served personally on Mr. Simon by myself.
 
 
 48
 So Mr. Simon was totally conversant for the reason on the present entire occasion and I assume he likewise advised his client that the contempt was on.
 
 
 49
 * * * * * *
 
 
 50
 The Court: I am considering having a hearing very shortly, so I would fix a hearing for 2:15.
 
 
 51
 Mr. Simon: May I have additional time with regard to a hearing? I want to prepare for such a hearing. I have not been served with any papers in this matter. I think I am entitled to due notice and some kind of papers, pursuant to which I can get ready to prepare an answer relating to same.
 
 
 52
 This has been an oral application as to which I hardly had any notice, as to which I am quite certain that with additional time I can find factors which —
 
 
 53
 The Court: As far as notice, you had a notice of motion for contempt.
 
 
 54
 Mr. Simon: The original notice upon which you have issued an order.
 
 
 55
 The Court: That is an application for contempt, and no suggestion was made about a hearing on that contempt motion at all, even when I made the order and it found so forth and so on, I don't think your position is sound.
 
 
 56
 Mr. Simon: I am sorry, sir, I take the position that we were required to have a hearing because certainly these are very serious matters.
 
 
 57
 The Court: There is no request for a hearing at all. This is the first time after all these meetings and conferences, the directions and orders of the Court that any suggestion has been made about a hearing.
 
 
 58
 Mr. Foglia: Your Honor, I urge the Court that the hearing be held at 2:15, because of the economic loss mounting each hour.
 
 
 59
 The Court: I think that it is a frightful situation, and under these circumstances we have to have our movement accordingly.
 
 
 60
 Mr. Simon: Your Honor, you recommended a radio announcement earlier, and I would say to you that I am prepared to arrange for such a radio announcement and I further — but I also want to have the hearing on the contempt, but I need time to prepare.
 
 
 61
 We were supposed to be returned here on the 30th. I would request that we go to the 30th on the contempt.
 
 
 62
 The Court: I can't go along with you. This delay is just unbearable.
 
 
 63
 Mr. Simon: I am sorry, sir. We have been doing all we can.
 
 
 64
 The Court: This has been noticed and they have not responded except by token performance or no performance at all. I can't conceive I have any right to delay on this situation.
 
 
 65
 Mr. Foglia: Thank you, your Honor.
 
 
 66
 The Court: I'll fix a hearing for 2:15 p. m.
 
 
 67
 Mr. Simon: I must take exception. [Emphasis added.]
 
 
 68
 A hearing was held at 2:15 on April 28, at which Emery presented various witnesses to prove that Local 295 and its officers had not been complying with the court's orders of April 22 and 26. Counsel for defendants refused to present evidence or to cross-examine, claiming insufficient time to prepare. At the end of the hearing, Emery moved for
 
 
 69
 the payment of the fine that you indicated yesterday in court and I ask that the same be paid to this court in favor of the Emery Air Freight forthwith and that the Court fix a daily damage in the sum of $66,000 commencing April 22, running to the current date.
 
 
 70
 The judge reserved decision on the request for additional daily fines of $66,000, but stated that "Of course, the $50,000 stands."
 
 
 71
 The following morning, April 29, the judge heard the lawyers further as to the current status of the strike. Upon being informed that most of the men had returned to work, the judge refused to grant the additional fines requested by Emery and stated that:
 
 
 72
 I am certainly mindful of the stress and strain that the plaintiff has undergone here, and certainly unjustifiably on the part of the defendants. But the indication here is that the defendants are, to an extent, endeavoring to cure the fault, so under all the circumstances, the fine of $50,000 and interest from April 27, 1971, will stand, and I shall adjourn this matter without date and the plaintiff will have the opportunity at any time to move for further relief.
 
 
 73
 On the next day, April 30, a full hearing was held in the application for a preliminary injunction, which we have already discussed.
 
 
 74
 Thus, it is quite clear that the April 27 Final Contempt Order was the product of a rushed series of legal maneuvers by the parties, compounded by the exigencies of a strike, which led the court into unintentionally denying to the defendants their right to a hearing. In re Green, 369 U.S. 689, 82 S.Ct. 1114, 8 L.Ed.2d 198 (1962). There was no real hearing before the April 27 order was signed. The judge apparently thought that the conference before him at noon on April 27 was a hearing on the application to hold defendants in contempt. But the attorney for Local 295 justifiably did not so regard it, since he had apparently informally initiated the conference, no papers called for such a hearing, no record was made of the proceedings, and no evidence was presented. Yet, the judge stated at that April 27 conference that unless the men returned to work forthwith, a fine of $50,000 would be assessed, which was done on April 27, and adhered to on April 28. Therefore, the critical decisions as to whether defendants were in contempt and, if so, what the sanction should be were made in an ambiguous procedural setting, and on an inadequate record. Such important questions cannot be decided in that manner, and the Final Contempt Order cannot stand. Nor can the evidence adduced at the April 28 or the April 30 hearing retroactively validate that order because the initial impact of the decision to fine defendants $50,000 obviously continued to influence the judge when he adhered to it. See In re Oliver, 333 U.S. 257, 284-285, 68 S.Ct. 499, 92 L.Ed. 682 (1948) (concurring opinion).[6] Since that original determination was made improperly, it must be set aside.
 
 
 75
 We do not suggest that appellants are thereby immunized from a finding of contempt or that their pattern of conduct, if a fuller record discloses it to be as egregious as it now appears, should be disregarded or encouraged. All that we hold is that the Final Contempt Order must be set aside, subject to whatever further proceedings as to contempt the parties request and the district court finds appropriate. At such proceedings, the court should consider, inter alia, the basic questions raised by appellants and alluded to above.
 
 
 76
 Preliminary injunction and contempt order reversed and case remanded for further proceedings consistent with this opinion.
 
 
 
 Notes:
 
 
 [1]
 The Local is affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America
 
 
 [2]
 Section 107 apparently contemplates oral testimony as a prerequisite for the issuance of restraining orders. See, e. g., 75 Cong.Rec. 4508 (1932) (remarks of Senator Norris); M. Forkosch, A Treatise on Labor Law § 212 n. 64 (2d ed. 1965);cf. Piedmont Aviation, Inc. v. Air Line Pilots Ass'n, Internat'l, 416 F.2d 633, 637 n. 7 (4th Cir. 1969). We need not consider those situations in which the claim may be made that the taking of such testimony is impossible and affidavits must be relied upon; the district court made no such finding here.
 
 
 [3]
 As will be seen below, defendants also argued to the district court that they were "perhaps" entitled to "even a jury trial" at a contempt hearing. See 18 U.S.C. § 3692
 
 
 [4]
 See C. Wright, Law of Federal Courts § 16 (2d ed. 1970); James, Book Review, 78 Harv.L.Rev. 1296, 1298 (1965); Tefft, Neither Above the Law nor Below It: A Note on Walker v. Birmingham, 1967 Sup.Ct.Rev. 181, 189-91 (1967); Cox, The Void Order and The Duty To Obey, 16 U. of Chi.L.Rev. 86 (1948)
 
 
 [5]
 The transcript (p. 4) uses the date of April 22, an obvious error
 
 
 [6]
 Mr. Justice Frankfurter stated:
 [A]n opportunity to meet a charge of criminal contempt must be a fair opportunity. It would not be fair, if in the court in which the accused can contest for the first time the validity of the charge against him, he comes handicapped with a finding against him which he did not have an adequate opportunity of resisting.