**NEW YORK NEWS, INC.,**
**Plaintiff,**

**v.**

**NEW YORK TYPOGRAPHICAL UNION NO. 6, affiliated with International Typographical Union, AFL–CIO, et al., Defendants.**

**No. 74 Civ. 1147.**

United States District Court,
S. D. New York.

April 1, 1974.

Townley, Updike, Carter & Rodgers, New York City, for plaintiff; John R. Schoemer, Jr., John D. Canoni, New York City, of counsel.

John J. Sheehan, New York City, for defendants.

GURFEIN, District Judge:

This is a motion for a preliminary injunction by the New York News, Inc. ("The News"), publisher of the New York Daily News and the Sunday News against New York Typographical Union No. 6 ("Local 6") affiliated with International Typographical Union, AFL–CIO ("I.T.U."), Bertram A. Powers, its President, David W. Crockett, its Vice-President, and Thomas W. Kopeck, its Secretary-Treasurer. The News seeks to restrain the defendants from any strike, work stoppage or other interference with normal employment or production at The News and to require the defendants to arbitrate.

Local 6 represents certain News employees known as typographers who work in the plaintiff's composing room and perform a number of tasks relating to the setting of type for the printing of the newspaper.

The News and Local 6 are parties to a labor contract, entered into on June 12, 1970, covering the composing room operations of The News for the stated period from March 31, 1970 through March 30, 1973. Section 87 of the contract provides:

> "If an agreement has not been reached by the date upon which the Contract expires, conditions prevailing prior to the expiration of this contract shall be maintained until an agreement is reached or other action is authorized by the I.T.U. [International Typographical Union] or by the Publisher signatory hereto or its agent."

No new agreement has been reached up to now, although negotiations have been going on since the summer of 1972 between Local 6, on the one hand, and representatives of the News, the New York Times and the New York Post. Each of the latter has a contract with Local 6, jointly negotiated and containing the same terms word for word.

The present action arises out of three separate unauthorized chapel meetings (union meetings) called by the defendants Powers and Crockett at The News' Manhattan plant on March 11, 1974 during business hours and without permis-

sion, although this was required by Section 49 of the contract.[1]

The News responded promptly by seeking and obtaining a temporary restraining order in the State Supreme Court from Justice Margaret Mary J. Mangan on March 11, 1974. At the same time, The News filed a grievance under Section 85 of the contract on the ground that the chapel meeting was unauthorized and a violation of the contract Sections 2, 4, 5, 49 and 87.[2] Local 6 refused to meet and on March 16, 1974, The News filed a demand for arbitration with the American Arbitration Association. Justice Mangan's order not only enjoined work stoppages and the like, but also ordered the defendants to proceed to arbitration. Instead, the Union removed the proceeding to this Court on the ground that the action "is one arising under Section 301 of the Labor Management Relations Act, 1947, as amended." The removal was proper, Avco Corp. v. Aero Lodge 735, 390 U.S. 557, 88 S.Ct. 1235, 20 L.Ed.2d 126 (1968), and the state court tempo-rary restraining order was automatically extended by virtue of 28 U.S.C. § 1450. To give counsel a chance to brief the matter, the order was continued here to March 25, 1974 at 5 P.M., without opposition.

An evidentiary hearing was held on March 25. Final briefs were submitted on March 27. To put the matter in perspective for an assessment of the legal issues posed, it is necessary to recite some earlier events as they appear in the record.

As indicated, although their contracts are individual contracts and are so labelled, the contracts of the Times and the Post are the same, and the three newspapers bargain collectively with Local 6. The Times was the first to be subjected to unauthorized chapel meetings during business hours. Local 6 called a chapel meeting in the Times plant as early as Labor Day, 1973. The Times responded by seeking an injunction in the state court. It obtained a final injunction from Justice Massi of the New York

---

1. Section 49 reads as follows:
"No employee may attend chapel meetings during his working hours without prior permission of the foreman. Chapel meetings on company premises shall be held in a location mutually agreeable to the office and the chapel."

2. Sections 49 and 87 have already been set forth. Section 2 provides in pertinent part as follows:
The Publishers agree to employ only journeymen and apprentices in the composing rooms of the Publishers. The Union offers to furnish the number of skilled workmen required by each office to perform all of the work within the jurisdiction of the Union, at the scale of wages and under the conditions set forth in their contract. Both parties agree that they have fully bargained with respect to wages, hours and other terms and conditions of employment and that they have settled these issues for the term of this agreement.
Section 4 reads as follows:
"It is the intention and the desire of the parties hereto that no strike or other interruption of normal employment or production shall occur during the life of this agreement. To this end the Union and the Publishers commit themselves to the orderly settlement of disputes as provided herein. However, New York Typographical Union No. 6 reserves to itself the right to direct its members to support a strike of this Union or of New York Mailers' Union No. 6, I.T.U., against any Publisher or Publishers signatory hereto which strike has been authorized under the laws of the I.T.U. Should such support or should unauthorized work stoppages by members of Typographical Union No. 6 result in substantial curtailment of composing room operations, the Publisher or Publishers thereby affected reserve the right to be relieved of the prohibition against the use of substitute processes or operations as provided in the jurisdictional section hereof during the period in which such support is granted or such substantial curtailment of operations continues. Upon resumption of normal operations, use of substitute processes or operations shall be discontinued. The Union agrees that it will not support a strike or work stoppage under any other circumstances."
Section 5 provides in pertinent part as follows:
The operation and control of each composing room is vested exclusively in the office through its representative, the general foreman, who shall be a member of the Union.

Supreme Court, after trial, on September 21, 1973. Local 6 appealed and the Appellate Division reversed (3 to 2). New York Times Co. v. New York Typographical Union No. 6, 43 A.D.2d 231, 350 N.Y.S.2d 676 (1 Dept. 1974). The Times appealed to the Court of Appeals which unanimously reversed the Appellate Division on February 22, 1974 and reinstated Justice Massi's permanent injunction order on the basis of his opinion below. The issue, in Justice Massi's opinion, was "whether there is an existing contract between the parties so as to require arbitration of a dispute in accordance with its arbitration provisions." He held that there was an existing contract and that the parties should proceed to arbitration. No specific finding was made, however, of what the issue was to be arbitrated, the reference being merely to "a dispute."

After Justice Massi's decision and before argument on the appeal in the Appellate Division, another event occurred. The parties, the three publishers and Local 6, procured the mediation services of Theodore W. Kheel, Esq. They entered into an "interim agreement . . . to promote collective bargaining" dated October 30, 1973 which provided in part that "[t]he status quo shall be maintained for the duration of this agreement. This means that there shall be no action by either side that will interfere with production." The "interim agreement" provided that "the negotiations with mediation shall continue until December 31, 1973, and thereafter by mutual agreement of the parties unless cancelled by written notice of either side on seven days notice at any time on or after December 24, 1973." It further provided that any disagreement regarding the terms of the "interim agreement" shall be submitted to and decided by Mr. Kheel and shall be final and binding on the parties.

Although the issue before the Appellate Division was whether the contract was still in force, neither the Times nor the Union tendered the "interim agreement" as bearing on the issue.

The News now contends that the affirmance by the Court of Appeals collaterally estops Local 6, which was the defendant in that action on the identical contract, from contending here that the contract with the News is not in existence. The union counters *inter alia* by asserting that the "interim agreement" was a superseding agreement which expired when the union gave notice on March 3, 1974 cancelling it, and that there is now no existing contract in spite of the Court of Appeals decision. It points to Article 87 of the original contract which provides that "conditions prevailing prior to the expiration of this contract shall be maintained until an agreement is reached or *other action* is authorized by the I.T.U. or by the Publisher signatory hereto or its agent." (Emphasis supplied). It contends that by signing the "interim agreement" the publisher took "other action", and terminated the extension of the contract provided in Article 87. It is conceded that I.T.U. has not authorized "other action" by Local 6.

The issues presented are: (1) Is there a collateral estoppel against Local 6, and if so what is its extent? (2) If there is an existing contract and the collateral estoppel is not coextensive with the remedy sought, is the injunctive remedy available to the employer in spite of the Norris-LaGuardia Act, 29 U.S.C. §§ 101, 104, 107, because of the doctrine of Boys Markets, Inc. v. Retail Clerk's Union, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970)?

I

■ The plaintiff contends that the decision by the Court of Appeals in New York Times v. Local 6 that the contract exists is *res judicata* against the union. The defendants contend that this Court is not bound by the state court decision under the Supremacy Clause, citing Tex-

tile Workers v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957), and Teamsters Local 174 v. Lucas Flour Co., 369 U.S. 95, 82 S.Ct. 571, 7 L.Ed.2d 593 (1961). While it is true that federal law governs, there is no reason why state law should be different from federal law on whether the contract was extended. I respect the unanimous opinion of the Court of Appeals in this regard.

■ Nor do I think that in this situation, where the effect of a collateral estoppel is asserted against the defendant which was also the defendant in the state case on the same issue, either the lack of mutuality of estoppel or the absence of privity, is fatal. Good Health Dairy Products Corp. v. Emery, 275 N. Y. 14, 18, 9 N.E.2d 758, 759 (1937). ". . . [T]he party *against* whom the plea is raised was a party to the prior action and 'had full opportunity to litigate the issue of its responsibility' (see Liberty Mutual Ins. Co. v. Colon, 260 N.Y. 305, 312, 183 N.E. 506)." *Id.* Perhaps the classic exposition was that of Mr. Justice Traynor in Bernhard v. Bank of America, 19 Cal.2d 807, 122 P. 2d 892 (1942). He noted that the exception to the requirement of mutuality of estoppel was justified "on the ground that it would be unjust to permit one who has had his day in court to reopen identical issues by merely switching adversaries." 122 P.2d at 895. The identity of the contracts of the three publishers make the issue concerning them "identical". Local 6 is estopped to deny the existence of the contract as of February 22, 1974, the date of the Court of Appeals affirmance. Since it could have tendered the "interim agreement" to the appellate courts as a substitute for the contract and failed to do so, I find its present contention that the "interim agreement" was *more* than a guideline to be an afterthought. The language that "the negotiations *with mediation* shall continue until December 31, 1973 . . . ." (emphasis supplied) seems to imply that negotiations *without* media-

tion were expected to continue in any event.

■ In sum, I find that the parties intended to continue the terms and conditions of the original contract until "other action" was taken, that the "interim agreement" was not "other action" by the News, and that the International Union has not authorized "other action" by Local 6, which, therefore, cannot lawfully engage in such action absent such permission.

We, therefore, confront an existing contract with a broad no-strike clause (Section 4) which contains only one exception, reading as follows:

"However, New York Typographical Union No. 6 reserves to itself the right to direct its members to support a strike of this Union or of New York Mailers' Union No. 6, I.T.U., against any Publisher or Publishers signatory hereto *which strike has been authorized under the laws of the I.T.U.*" (Emphasis supplied).

This exception is not applicable in the case at bar, because the I.T.U. has refused to sanction the interruption of production.

Section 85 provides a grievance procedure which begins with conciliation and ends with arbitration by a board. The procedures relate to "any controversy (except as provided otherwise herein). . . ." The provisos are: (1) that the board shall have jurisdiction only over controversies properly and specifically referred to it; (2) that its decisions cannot abridge the fundamental rights reserved by and to the signatory Publisher and the Union; (3) that local union laws not affecting wages, hours or working conditions and the General Laws of the I.T.U. at the time of the signing of the contract, shall not be subject to arbitration.

The arbitration section ends with the statement: "nothing herein obligates ei-

ther party to arbitrate differences respecting a succeeding contract."

It is in the light of these several provisions and exceptions that we turn to the federal law limiting the injunctive remedy.

## II

In Textile Workers Union of America v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957), the Supreme Court held that Section 301 of the Labor-Management Relations Act, 29 U.S.C. § 185(a), giving jurisdiction to the federal courts was not merely procedural but established federal substantive law to secure enforcement of collective bargaining agreements. The substantive law to be applied was "federal law, which the courts must fashion from the policy of our national labor laws." 353 U.S. at 456, 77 S.Ct. at 918.

In Boys Markets, supra, the Court held, overruling Sinclair Refining Co. v. Atkinson, 370 U.S. 195, 82 S.Ct. 1328, 8 L.Ed.2d 440 (1962), that Section 301 and the Norris-LaGuardia Act could be accommodated since "the central purpose of the Norris-LaGuardia Act to foster the growth and viability of labor organizations is hardly retarded . . . by a remedial device that merely enforces the obligation that the union freely undertook under a specifically enforceable agreement to submit disputes to arbitration" 398 U.S. at 252–253, 90 S.Ct. at 1593.

The Court in Boys Markets adopted the principles in Mr. Justice Brennan's dissent in Sinclair to guide the district courts in deciding whether to grant injunctive relief under Section 301. The Court noted that " '[w]hen a strike is sought to be enjoined because it is over a grievance which both parties are contractually bound to arbitrate, the District Court may issue no injunction order until it first holds that the contract does have that effect. . . . 370 U.S. at 228 [82 S.Ct. 1328]. (Emphasis in original).' " 398 U.S. at 254, 90 S.Ct. at 1594.

It has been made clear that a mere violation of a no-strike clause by a union is not enough to support injunctive relief unless the dispute on which the strike is based was arbitrable under the collective bargaining agreement. See New York Telephone Co. v. Communications Workers of America, 445 F.2d 39, 50 (2 Cir. 1971), where the Court said "the remedy [of injunction] must be limited to vindicating the arbitration process." In Emery Air Freight Corp. v. Local Union 295, 449 F.2d 586 (2 Cir. 1971), the Second Circuit again articulated the limitation of Boys Markets that "in order to enjoin a labor dispute, the Court must find that both parties are required to arbitrate the dispute. . . ." 449 F.2d at 589. In that case, the Court of Appeals found "that the major dispute between the parties was whether a new contract existed. . . . This dispute was not arbitrable because Emery and Local 295 had never agreed to make it so." 449 F.2d at 591. Accordingly, "under the Norris-LaGuardia Act, and the Boys Markets reading of it, the preliminary injunction was improper because the 'strike . . . sought to be enjoined . . . [was not] over a grievance which both parties are contractually bound to arbitrate. 398 U.S. at 254 [90 S.Ct. 1583 at 1594]. . . . .' " 449 F.2d at 591. See also Amstar Corp. v. Amalgamated Meat Cutters & B. Workmen, 468 F.2d 1372 (5 Cir. 1972).

In Parade Publications, Inc. v. Philadelphia Mailers Union, 459 F.2d 369 (3 Cir. 1972), the Court vacated an injunction and remanded to the district court for a finding "as to what caused the strike and whether the underlying issue is arbitrable." (Emphasis supplied. 459 F.2d at 373–374).

With the clear language of the Supreme Court in Boys Markets, and the unanimous gloss upon it of the Courts of

Appeal that have considered the issue, we now turn to the contentions of the parties as so limited.

The News in its complaint alleges that on March 11, 1974 defendants began a strike or work stoppage at the composing room of plaintiff's newspaper, the result of which was to interfere with the normal production of such newspaper and that such action constitutes a violation of the provisions of the contract. It alleged that Section 4 provides that there is to be no strike or other interruption during the life of the contract and that Section 85 provides that any controversy arising under the agreement is to be submitted to arbitration. It also alleges that under Section 5 the composing room is exclusively under the control of the foreman, with the inference that he gave no permission for the work stoppage.

It is understandable that a complaint drafted for a state court action should not be more specific with respect to the nature of the dispute that made it arbitrable, for the restrictions on injunctive relief in the Norris-LaGuardia Act are not applicable to the States. See *Boys Markets, supra,* 398 U.S. at 246–247, 90 S.Ct. 1583.

When the action is removed to the federal court, however, the Court is bound by that Act, and for an injunction to issue, as distinguished from a judgment for damages, there must be, as we have seen, a finding at least that the dispute was arbitrable under the contract. Here we come to the nub of the issue.

The plaintiff says that the arbitration clause is broad, hence *any* dispute is arbitrable. The defendants say that only disputes *under the contract* are arbitrable, but those disputes which do not arise under contractual commitments to arbitrate are not arbitrable. If the dispute, the union contends, is dehors the contract, economic pressure by the union *may not be enjoined under the Norris-LaGuardia Act.*

There was no specific grievance that triggered the chapel meeting slowdown. The union contends, and it cannot be seriously controverted, that its avowed purpose is to bring economic pressure on The News to grant better terms in the new contract. The union points out that in Section 85 of the contract it is provided that "[n]othing herein obligates either party to arbitrate differences respecting a succeeding contract."

■ Here the union contends that there is no longer an existing contract. The New York Court of Appeals and this Court find that there is. The question then is whether the dispute is arbitrable under the existing contract.

This contract is unusual because the right to resort to economic sanction is vested in the International Union rather than in Local 6 which is the signatory to the contract. The local union gave its fortunes as hostage to its International. One may speculate as to the reason for this provision, but it is a consensual provision arrived at in collective bargaining. In spite of this contractual limitation on its right to bring economic weapons to bear, Local 6 claims, nevertheless, that it now has the right to do so. This must necessarily bring into controversy an interpretation of the contract. The arbitrable issue is whether the I.T.U. or the Employer has taken "other action" so as to free Local 6 of the restrictions on its use of economic weapons. This is a controversy within the broad arbitration clause and comes within none of its stated exceptions. In this particular case, the local union contends that it is bringing economic pressure only for the purpose of forcing a favorable new contract, and that, since such action is not arbitrable, an injunction may not issue.

It is true that injunctions in labor disputes may not be granted by the district courts, but it is also true that contractual commitments to arbitrate will be specifically enforced. The defendants cannot simply lift themselves out of the

contract by a unilateral assertion that "other action" has been committed by the plaintiff. Under this contract that would be for the arbitrators to decide.

Local 6 goes even further in its claim that there is no issue susceptible to enforcement by compelling arbitration. It argues that its job action is only with reference to the negotiations for the new contract and has nothing to do with the old.

This ingenious argument, if accepted, would make it easy to circumvent a no-strike clause by simply avowing such a purpose. *Cf.* Food Fair Stores, Inc. v. Food Drivers, H. & W. Local No. 500, 363 F.Supp. 1254 (E.D.Pa.1973). On this view, Local 6 could have started to "pressure" The News as early as the summer of 1972 when the first negotiating session was held. That would hardly have been in the contemplation of the parties when they agreed to arbitrate their differences during the life of the contract and to abandon strikes and lockouts. Nor would it be consistent with the rationale of the policy enunciated by the Supreme Court in *Boys Markets*. See also United Steelworkers v. Warrior & Gulf Navigation Co., 363 U. S. 574, 582–583, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960).

Fortunately, it is not necessary for me to decide, as a general proposition, whether a union may use economic sanctions to obtain a favorable *new* contract at a time when it is bound not to use such sanctions under the old. The interposition of the authority of the I.T.U. by agreement of the parties in this particular contract makes that rather intriguing question unnecessary to decide. Whether the local union can act on its own, unfettered by the International, is, in this special case, itself an arbitrable issue.

The arbitration will, of course, not consider what are proper terms of the contract being negotiated, since the parties agreed to the contrary in Section 85.

I must assume that the International Union is faithful in its trust to its members. Since it has not lifted a finger to permit its daughter to harass the publishers by economic pressure in the negotiations thus far, it is hardly to be expected that a district court should be more zealous. If the I.T.U. should act under the contract, the situation would allow reconsideration. Until that happens a preliminary injunction will issue, on equitable grounds, under *Boys Markets* restraining Local 6 from strikes, stoppages and slowdowns of production, and ordering arbitration to proceed.

The foregoing shall constitute the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).